**OWENS CORNING, Appellant**

v.

**Glenn HEGAR, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas, Appellees**

No. 04-16-00211-CV

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: April 5, 2017

Doug Sigel, Ryan Law Firm LLP, 100 Congress Avenue, Suite 950, Austin, TX 78701, for Appellant.

Charles K. Eldred, Assistant Attorney General, Financial Litigation, Tax, and Charitable Trusts Division, P.O. Box 12548, Austin, TX 78711, for Appellee.

Sitting: Marialyn Barnard, Justice, Patricia O. Alvarez, Justice, Irene Rios, Justice

## OPINION

Opinion by: Patricia O. Alvarez, Justice

The underlying lawsuit arises out of Owens Corning's request for a franchise tax refund for report year 2008. Owens Corning appeals the trial court's order granting a summary judgment in favor of Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas (collectively the State). The issue presented on appeal is whether the trial court erred in concluding Owens Corning's payment for product liability damages is not within the scope of the "costs of quality control" as that term is used in section 171.1012(d)(9) of the Texas Tax Code. We affirm the trial court's order.

### Background

In its 2008 franchise tax reporting period, as part of an asbestos products liability settlement during its bankruptcy reorganization, Owens Corning made a one-time payment of $2,195,316,694 into an asbestos trust fund. After it filed its franchise tax return, Owens Corning filed a franchise tax refund claim in which it included the trust fund payment as a cost of goods sold, specifically, under costs of quality control. The Comptroller denied the refund claim, and Owens Corning sued.

Owens Corning and the State filed competing motions for summary judgment based primarily on stipulated facts. In the State's motion for summary judgment, it included a list of facts to which the parties stipulated for purposes of the motion. We recite some of them here.

3. Owens Corning timely submitted an administrative refund request for franchise tax paid in report year 2008.

4. The administrative refund request included an argument that Owens Corning's cost-of-goods-sold deduction should include an additional $2,195,316,694, which would lower Owen[s] Corning's franchise tax for report year 2008 by $882,182.59. Owens Corning requested a refund in that amount.

. . .

7. Owens Corning sold products containing asbestos until 1973. Owens Corning has not made products containing asbestos since 1973. Many of Owens Corning's products containing asbestos remained in use after 1973.

8. Many plaintiffs sued Owens Corning, alleging that the products containing asbestos were defective and caused them personal injuries ("asbestos product-liability lawsuits").

9. In report year 2008, Owens Corning took advantage of a federal law which allowed it to be free of all pending and future asbestos product-liability lawsuits in return for a payment of $2,195,316,694 into an asbestos trust fund. The purpose of the trust fund is to pay personal-injury claims in pending

and future asbestos product-liability law-suits.

The trial court granted the State's motion for summary judgment. The trial court's order states the following:

While the Court does not accept either side's proffered interpretation of the statutory meaning of "costs of quality control" found in Tex. Tax. Code § 171.1012(d)(9), the Court does find that the costs at issue are not the costs of quality control under Tex. Tax. Code § 171.1012(d)(9). The Court equates the payment made to the trust, which is to compensate for injuries resulting from the use of products that have not been manufactured since 1973, to product liability damages. Furthermore, the Court does not find that product liability damages are a cost of quality control.

Owens Corning appeals.

## STANDARD OF REVIEW

To prevail on a traditional motion for summary judgment, the movant must show "there is no genuine issue as to any material fact and the [movant] is entitled to judgment as a matter of law." TEX. R. CIV. P. 166a(c); see also Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 846 (Tex. 2005). We generally review a trial court's granting of a summary judgment de novo. Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).

As previously noted, the parties in this case stipulated to the facts material to the outcome of their dispute; therefore, "the propriety of summary judgment is a question of law." Upjohn Co. v. Rylander, 38 S.W.3d 600, 605 (Tex. App.—Austin 2000, pet. denied). Similarly, "[s]tatutory construction is a question of law that we review de novo." Sw. Royalties, Inc. v. Hegar, 500 S.W.3d 400, 404 (Tex. 2016). Because the parties filed competing motions for summary judgment, and the tri-al court granted the State's motion and denied Owens Corning's motion, "we determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered." Sw. Bell Tel., L.P. v. Emmett, 459 S.W.3d 578, 583 (Tex. 2015); accord Upjohn Co., 38 S.W.3d at 605.

## STATUTORY CONSTRUCTION PRINCIPLES

In construing a statute, "[o]ur primary objective is to give effect to the Legislature's intent, which we ascertain from the plain meaning of the words used in the statute, if possible." Sw. Royalties, Inc., 500 S.W.3d at 404. Stated differently, "[i]f a statute is worded clearly, we must honor its plain language, unless that interpretation would lead to absurd results." Combs v. Health Care Servs. Corp., 401 S.W.3d 623, 629 (Tex. 2013). "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning." TGS-NOPEC Geophysical Co. v. Combs, 340 S.W.3d 432, 439 (Tex. 2011). "We further consider statutes as a whole rather than their isolated provisions." Id. Finally, "[i]f a word is connected with and used with reference to a particular trade or subject matter or is used as a word of art, the word shall have the meaning given by experts in the particular trade, subject matter, or art." TEX. GOV'T CODE ANN. § 312.002(b) (West 2013); accord Edwards Aquifer Auth. v. Day, 274 S.W.3d 742, 757 (Tex. App.—San Antonio 2008), aff'd, 369 S.W.3d 814 (Tex. 2012).

## FRANCHISE TAX CALCULATION

As the Austin court of appeals recently noted, "[t]he franchise-tax statute has been substantively amended several times since its enactment." Hegar v. CGG Veritas Servs. (U.S.), Inc., No. 03-14-00713-CV,

2016 WL 1039054, at *1 (Tex. App.—Austin Mar. 9, 2016, no pet.) (mem. op.). In this case, the applicable statutory provisions are those that were in effect on January 1, 2008. *See id.*

"Under that version of the franchise-tax statute, after calculating total revenue the taxpayer compute[s] its 'taxable margin' by first determining its 'margin.' " *Id.* "The 'margin' is the lesser of (1) 70% of the taxable entity's total revenue or (2) the taxable entity's total revenue minus, at the entity's election, either cost of goods sold, as determined under section 171.1012 (the COGS calculation) or compensation, as determined under section 171.1013 (the compensation calculation)." *Id.* After calculating its margin, the taxpayer then performs additional calculations to determine its taxable margin, which is multiplied by its tax rate to determine its franchise tax. *See Hallmark Mktg. Co., LLC v. Hegar*, 488 S.W.3d 795, 796 (Tex. 2016).

In this case, the issue in dispute relates to Owens Corning's calculation of its margin. More specifically, the issue involves whether Owens Corning could deduct its payment to the asbestos trust fund from its total revenue as a cost of goods sold.

## CONSTRUING A DEDUCTION

The parties' first dispute relates to whether section 171.1012 should be construed strictly against Owens Corning or liberally in favor of Owens Corning. Owens Corning contends the statute should be liberally construed in its favor, while the State contends the statute should be construed strictly against Owens Corning. We agree with the State.

In general, "[s]tatutes imposing a tax must be strictly construed against the taxing authority and liberally construed in favor of the taxpayer." *Sergeant Enters. v. Strayhorn*, 112 S.W.3d 241, 245 (Tex. App.—Austin 2003, no pet.); *Upjohn Co.*,

38 S.W.3d at 606. "Deductions and exemptions, on the other hand, are matters of legislative 'grace.' " *Upjohn Co.*, 38 S.W.3d at 606. As a result, "we construe tax exemptions—and provisions tantamount to tax exemptions—strictly against the taxpayer and in favor of the taxing authority." *Id.*; *accord Sergeant Enters.*, 112 S.W.3d at 246 ("Deductions . . . are strictly construed against the taxpayer.").

In this case, section 171.1012 allows a taxpayer to deduct cost of goods sold from its total revenue in calculating its margin. Accordingly, we strictly construe section 171.1012 against Owens Corning and in favor of the State. *See Sergeant Enters.*, 112 S.W.3d at 245–46; *Upjohn Co.*, 38 S.W.3d at 606.

## SECTION 171.1012(d)(9)

The Tax code section 171.1012 effective in 2008, titled "Determination of Cost of Goods Sold," included definitions and formulas pertaining to calculating the cost of goods sold. Subsection (c) listed thirteen categories of items that were included in the cost of goods sold; subsection (d)(9), the focus of this suit, provided as follows:

> (d) In addition to the amount includable under Subsection (c), the cost of goods sold includes the following costs in relation to the taxable entity's goods:
>
> . . .
>
> (9) the costs of quality control, including replacement of defective components pursuant to standard warranty policies, inspection directly allocable to the production of the goods, and repairs and maintenance of goods. . . .

Act of May 2, 2006, 79th Leg., 3rd C.S., ch. 1, § 5, sec. 171.1012, 2006 Tex. Gen. Laws 1, 13 (amended 2013) (current version at TEX. TAX CODE § 171.1012).

## A. Parties' Arguments

In its arguments, Owens Corning relies heavily on its contention that "costs of quality control" is a technical term to be given the meaning of experts in the field; Owens Corning then draws from the opinions given by its expert in his affidavit. Owens Corning also relies on the Code Construction Act which defines "includes" and "including" as "terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE ANN. § 311.005(13) (West 2013) (addressing "General Definitions" as part of the Code Construction Act). Finally, Owens Corning contends the use of the word "of" in costs of quality control does not limit the costs to the performance of successful quality control but also includes costs from failed quality control.

The State contends Owens Corning's expert opinion is unreliable and incorrect. Alternatively, the State argues the expert agrees with the numerous dictionary definitions of "quality control" which support the State's position that personal injury damages are not costs of quality control. The State also argues the legislature's use of the word including does not mean costs of quality control include damages paid in products liability cases. Finally, the State argues costs of quality control does not include costs incurred after quality control has ended, and asserts Owens Corning stopped incurring costs in controlling the quality of its products containing asbestos in 1973.

Just as the trial court did not "accept either side's proffered interpretation of the statutory meaning of 'costs of quality control,'" we also are not persuaded by either party's arguments with regard to the correct interpretation of section 171.1012(d)(9). Accordingly, we do not address each of the parties' individual arguments. Instead, we set forth our analysis of section 171.1012, and our reasons for concluding the term costs of quality control as used in section 171.1012(d)(9) does not include the payment Owens Corning made to the asbestos trust fund.

## B. Expert's Testimony

Owens Corning attached Dr. Douglas Montgomery's affidavit to its motion for summary judgment, asserting costs of quality control is a technical term that "shall have the meaning given by experts in the particular trade, subject matter or art." *See* TEX. GOV'T CODE ANN. § 312.002(b) (addressing "Meaning of Words" as part of Subchapter A, "Construction Rules for Civil Statutes"). Dr. Montgomery is a professor of industrial engineering and statistics with "widespread experience in consulting related to engineering applications of quality control and operations research methods."

In his affidavit, Dr. Montgomery distinguishes between the terms "quality" and "quality control" and the terms "quality costs" and "costs of quality control." Dr. Montgomery then explains, "The measurement and management of costs of quality control are key elements of companies' accounting systems because such costs can be as significant as the traditional labor, materials, engineering, and selling costs of a product." Dr. Montgomery also explains, "There is an extensive body of literature on the definition and management applications of the costs of quality control and quality costs." Dr. Montgomery then opines, "Manufacturing and service organizations generally break down the costs of quality control into four categories to assist in analyzing and controlling their costs of quality control: 1) prevention costs; 2) appraisal costs; 3) internal failure costs; and 4) external failure costs." Dr. Mont-

gomery defines an external failure cost as a cost which occurs "when the product does not perform satisfactorily and fails to meet customer expectations after it is delivered to the customer."

Dr. Montgomery categorizes the payment made by Owens Corning to the asbestos trust fund as a liability cost which he defines as "costs incurred by the company arising as a result of product liability or tort litigation." He then categorizes liability costs as external failure costs.

With regard to section 171.1012(d)(9), Dr. Montgomery asserts two of the examples of costs of quality control included in section 171.1012(d)(9) are external failure costs, namely "replacement of defective components pursuant to standard warranty policies" and "repairs and maintenance of goods." Dr. Montgomery further asserts, "In the quality control literature, and based on my personal experience, no basis exists to distinguish the two examples of the costs of quality control used by the legislature, and other external failure costs." Therefore, Dr. Montgomery concludes the payment made by Owens Corning to the asbestos trust fund "arising from the company's legal liability for personal injury or death claims caused by exposure to asbestos-containing products constitutes a cost of quality control, because these costs are external failure costs."

## C. Analysis

■ Although Dr. Montgomery's argument gains some support from section 171.1012(d)(9) if it is read in isolation, the rules of statutory construction do not allow such an isolationist approach. *See TGS-NOPEC*, 340 S.W.3d at 439. Instead, as previously noted, we must "consider statutes as a whole rather than their isolated provisions." *See id.* In addition, because we are construing a statutory provision that allows Owens Corning to take a deduction, we strictly construe section 171.1012 against Owens Corning and in favor of the State. *See Sergeant Enters.*, 112 S.W.3d at 245–46; *Upjohn Co.*, 38 S.W.3d at 606. By applying these rules of statutory construction, we find a basis for distinguishing "the two examples of the costs of quality control used by the legislature" from Owens Corning's "legal liability for personal injury or death claims caused by exposure to asbestos-containing products."

First, we must examine section 171.1012(d)(9) in its context as a subsection of section 171.1012. Section 171.1012 sets forth the manner in which a taxpayer's cost of goods sold is determined, which is the amount the taxpayer may subtract or deduct from its total revenues to determine its margin. *See* Act of May 2, 2006, 79th Leg., 3rd C.S., ch. 1, § 5, secs. 171.101(a)(1)(B)(ii)(a), 171.1012, 2006 Tex. Gen. Laws 1, 8, 13 (amended 2013). Therefore, in ascertaining the meaning of the legislature's use of the term costs of quality control in subsection 171.1012(d), the term must be considered in the context of the legislature's inclusion of the term as a component of the broader term cost of goods sold. In addition, the legislature further qualifies the additional costs to be included under subsection 171.1012(d) by broadly limiting them to "costs in relation to the taxable entity's goods." *Id.* § 171.1012(d). Therefore, we must examine the three examples the legislature provided to assist in our understanding of its use of the term costs of quality control knowing the legislature viewed the term as a subset of cost of goods sold and as a cost that is "in relation to the taxable entity's goods."

Next, strictly construing against Owens Corning the legislature's examples of costs of quality control, we conclude each example involves a cost spent on the product or

good itself to improve its quality. *See Sergeant Enters.*, 112 S.W.3d at 245–46; *Upjohn Co.*, 38 S.W.3d at 606. The first example, the cost of "replac[ing] defective components pursuant to standard warranty policies," involves money spent on replacing a component of the product or good itself to improve its quality. Similarly, the cost of "inspection directly allocable to the production of the goods" involves money spent during production to improve the quality of the product or good itself. Finally, the cost of "repair and maintenance of goods" is money spent on repairing or maintaining the product or good itself to improve its quality.

Unlike the three examples provided by the legislature, the payment Owens Corning made to the asbestos trust fund to compensate plaintiffs for personal injuries caused by the asbestos-containing products Owens Corning stopped producing in 1973 was not money spent to improve the quality of the asbestos-containing products or goods themselves. Therefore, we hold Owens Corning's payment to the asbestos trust fund "to pay personal-injury claims in pending and future asbestos-product-liability lawsuits" is not a cost of quality control under section 171.1012.

### CONCLUSION

Having construed tax code section 171.1012 as a whole rather than in isolation, we hold that the legislature did not intend for costs of quality control to include Owens Corning's payment to the asbestos trust fund to pay for personal-injury claims. Because there were no genuine issues of material fact and the State was entitled to judgment as a matter of law, we conclude the trial court did not err, and its order is affirmed.