# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON RECONSIDERATION EN BANC

## NO. 03-18-00790-CV

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas, Appellants**

**v.**

**El Paso Electric Company, Appellee**

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-17-006837, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

## O P I N I O N

The opinions and judgment issued on August 13, 2020, are withdrawn, and the following opinion is substituted.

Glen Hegar, Comptroller of Public Accounts, and Ken Paxton, Attorney General, (collectively, the Comptroller) appeal from the trial court's judgment following a bench trial that granted in part El Paso Electric Company's (EPE) refund claims for sales taxes paid on transactions involving "telemetry units." *See* Tex. Tax Code § 151.318(a)(4). In two issues, the Comptroller challenges the trial court's subject matter jurisdiction over EPE's refund claims and, if the trial court had jurisdiction, the trial court's conclusion that the manufacturing exemption

applied to the transactions in question.  *See id.*  For the following reasons, we affirm the trial court's judgment.

## BACKGROUND[1]

**Manufacturing Exemption**

To give context to the parties' dispute, we briefly discuss the manufacturing tax exemption and its applicable statutory provision.  The manufacturing exemption is an exception to the general rule that sales tax is imposed on any "sale" of a "taxable item" in the state.  *See* Tex. Tax Code §§ 151.051 (stating general rule that "tax is imposed on each sale of a taxable item in this state"), .318(a) (exempting items "from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer"); *see Silicon Labs., Inc. v. Hegar*, No. 03-17-00061-CV, 2018 Tex. App. LEXIS 5323, at *1–2 (Tex. App.—Austin July 13, 2018, pet. denied) (mem. op.) (generally describing manufacturing exemption); *GTE Sw. Inc. v. Combs*, No. 03-08-00561-CV, 2010 Tex. App. LEXIS 4223, at *7–9 (Tex. App.—Austin June 3, 2010, pet. denied) (mem. op.) (same).  In general terms, "[t]he manufacturing exemption exempts a person who produces certain types of tangible personal property for sale to ultimate consumers from having to pay sales tax on its purchase of certain otherwise-taxable tangible personal property that is used in the production process."  *Combs v. Home & Garden Party, Ltd.*, No. 03-09-00673-CV, 2010 Tex. App. LEXIS 8875, at *7 (Tex. App.—Austin Nov. 3, 2010, no pet.) (mem. op.).

---

[1] The facts are taken primarily from the trial court's unchallenged findings of facts and from the administrative law judge's Proposal for Decision in the administrative proceedings, which the Comptroller adopted.

Relevant to the parties' dispute, Subsection 151.318(a)(4) provides:

> (a) The following items are exempt from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer:
>
> . . .
>
> (4) actuators, steam production equipment and its fuel, in-process flow through tanks, cooling towers, generators, heat exchangers, transformers and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are related to the transformers, electronic control room equipment, computerized control units, pumps, compressors, and hydraulic units, that are used to power, supply, support, or control equipment that qualifies for exemption under Subdivision (2) or (5) or to generate electricity, chilled water, or steam for ultimate sale; transformers located at an electric generating facility that increase the voltage of electricity generated for ultimate sale, the electrical cable that carries the electricity from the electric generating equipment to the step-up transformers, and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are related to the step-up transformers; and transformers that decrease the voltage of electricity generated for ultimate sale and the switches, breakers, capacitor banks, regulators, relays, reclosers, fuses, interruptors, reactors, arrestors, resistors, insulators, instrument transformers, and telemetry units that are related to the step-down transformers.

Tex. Tax Code § 151.318(a)(4). The parties' dispute concerns the last listed item in Subsection (a)(4)—"telemetry units that are related to the step-down transformers." *Id.*

**Administrative Proceedings**

EPE filed refund claims for sales taxes that it paid for the audit period April 1, 2006, through December 31, 2009. The Comptroller does not dispute that EPE is a manufacturer of electricity for Texas sales tax purposes but denied EPE's tax refund claims concerning customer meters, substation meters, and collars that EPE purchased, installed, and used to provide electricity to its customers.

3

The customer meters are used at customer locations, are part of a local network, and are physically connected by wire to local step-down transformers. A step-down transformer is equipment that is installed in customer areas or neighborhoods—either on a utility pole or underground—to reduce the voltage of electricity entering a customer's location to make it usable for the customer's purposes. The substation meters interface with the step-down transformers to provide direct data on how the step-down transformers are functioning, including their voltage, and the collars are installed on the meters and allow EPE to send a signal to shut off a customer's electricity service. EPE sought a refund of the sales taxes paid on these items based on the manufacturing exemption because the items were "telemetry units that are related to the step-down transformers."[2] *See id.*

In the Proposal for Decision (PFD) that the Comptroller adopted, the administrative law judge (ALJ) sustained staff's objection to EPE's refund claims for sales taxes paid on the transactions concerning the meters and collars to the extent the claims were based on the manufacturing exemption. The ALJ agreed with staff that EPE's argument that was based on the manufacturing exemption was "not timely raised" under the Comptroller rule setting the deadline for EPE to amend its statements of grounds and excluded the issue from consideration in the contested case hearing. *See* 34 Tex. Admin. Code § 1.11 (Comptroller of Public Accounts, Statement of Grounds; Preliminary Conference) (setting out content of statement of grounds and

---

[2] EPE also argued in the administrative proceedings that the items in question were purchases for resale as a separate ground for claiming an exemption from sales tax. *See* Tex. Tax Code §§ 151.006 (defining "sale for resale"), .302 (exempting "sale for resale of a taxable item" from taxes imposed by chapter). That ground is not at issue in this appeal.

deadline for amending statement of grounds).[3]  EPE challenged this decision in its motion for rehearing, which the Comptroller denied.  EPE then filed its suit for tax refund.

**Plea to the Jurisdiction**

Prior to the bench trial, the Comptroller filed a plea to the jurisdiction that challenged the trial court's jurisdiction over EPE's refund claims.  In his plea, the Comptroller asserted that EPE waived the opportunity to raise the manufacturing exemption with respect to the transactions concerning the meters and collars because it failed to comply with the procedural requirements of Subsection 111.104(c)(2) of the Tax Code and the Comptroller rule that set the deadline for EPE to amend its statements of grounds.  *See* Tex. Tax Code § 111.104(c)(2) (requiring claim for refund to "state fully and in detail each reason or ground on which the claim is founded"); 34 Tex. Admin. Code § 1.11.  EPE filed a response to the Comptroller's plea to the jurisdiction, and the parties presented jurisdictional evidence.

The evidence before the trial court included filings in the administrative proceedings, such as EPE's initial claims for refunds, its statements of grounds and supporting schedules, the PFD, and EPE's motion for rehearing.  EPE's statements of grounds refer to the manufacturing exemption among the stated grounds for EPE's claims for refund and quote Section 151.318, including Subsection (a)(4).  The supporting schedules also identify specific transactions involving "meters" by line item that include detailed information about the particular transaction including dates, invoice numbers, and amounts and specifically refer to the manufacturing exemption—such as by listing "mfg. equip.—100% exempt"—and Section

---

[3]  Although a prior Comptroller rule applies in this case, we cite the current rule for convenience.  Its requirements are substantially the same and do not affect our analysis.

5

151.318, as well as the applicable Comptroller rule.[4]  *See* Tex. Tax Code § 151.318; 34 Tex. Admin. Code § 3.300 (Comptroller of Public Accounts, Manufacturing; Custom Manufacturing; Fabricating; Processing).

EPE also filed an affidavit by its designated tax representative.  In his affidavit, the tax representative averred that "[o]n the schedules submitted with the refund claim[s], meters were listed as exempt manufacturing equipment."  The representative similarly swore as to the schedules that were provided with the statements of grounds as follows:  "On these schedules, the reason for the refund for meters and related items was both 'mfg. equip.—100% exempt' and cited the primary tax references 'TTC 151.318; TAC 3.300.'"  The representative further averred about EPE's refund claims based on the manufacturing exemption during the administrative proceedings, including that "[t]he manufacturing exemption was claimed with respect to the meters from the initial request for refund hearing and no additional transactions were added during the refund hearing procedure or SOAH matter that were not included in the requests for

---

[4] As to the detailed information provided on the schedules, EPE's "Accounts Payable Invoices" schedules identify specific transactions by line item, and each line item provides the vendor, invoice date, invoice number, description, applicable Tax Code provision(s) and Comptroller rule(s), amount of taxes paid, amount of refund requested, and the reason or ground for the request.  Similarly, EPE's "Inventory Issuances" schedules identify specific transactions by line item, and each line item provides the item number, transaction date, item description, the applicable provision(s) of the Tax Code and Comptroller rules, amount of cost, taxes paid, and amount of refund requested.  Another schedule provided by EPE during the administrative proceedings identifies specific transactions by line item, and each line item provides an image link, vendor number, vendor name, invoice date, issue, description, reason for refund request with reference to applicable Tax Code provision(s) and Comptroller rules, account description, work order, work order description, charging cost description, project number, amount of taxes paid, and amount of refund requested.  In the PFD, the ALJ found:  "Most of the meter purchases at issue were made from Itron Electricity Metering, Inc. (Itron).  The primary two models that were purchased were the Centron and Sentinel."  The line items on the schedules identifying the specific transactions involving Centron and Sentinel consistently refer to the manufacturing exemption and Section 151.318 as a stated ground for seeking a refund.

refund hearing" and that, during the administrative proceedings, EPE "removed other remaining transactions related to the meters on the schedules exchanged with the Comptroller but did not ever remove the meters themselves from its manufacturing exemption claim."

Following a hearing, the trial court denied the Comptroller's plea to the jurisdiction.

**Bench Trial**

Shortly after the trial court denied the Comptroller's plea to the jurisdiction, the case was tried to the bench. EPE's witness was its metering supervisor, who had worked for EPE for forty years, and its exhibits included schedules showing the requested refund per transaction by line item and in summary. The Comptroller did not call any witnesses, and the parties agreed to the amount of refund that would be owed based on the trial court's ruling.

The metering supervisor testified about the role and functionality of the substation meters, customer meters, and collars and their respective relationships with step-down transformers within local networks. In his closing statement, the Comptroller's counsel acknowledged that "with regard to the substation meters, the testimony has been that the substation meters are dedicated to the step-down transformers and they telecommunicate the metrics of the transformers" and that "the State will acknowledge that those things are telemetry units related to step-down transformers." But he disputed that the customer meters or collars qualified for the exemption on that basis.

The trial court thereafter entered judgment awarding EPE $211,880.79. The trial court also made findings of fact and conclusions of law. The trial court ruled in EPE's favor as to the transactions involving the substation meters and customer meters, concluding that those

7

transactions were tax exempt under the manufacturing exemption, but the trial court denied EPE's refund claims as to the sales taxes paid on the transactions involving the collars. Concerning the customer meters and their relation to step-down transformers, the trial court's findings of fact include:

> 10. EPE purchased, installed, and used customer meters at customer locations.
>
> 11. Customer meters were part of a local network that were connected to local stepdown transformers, used to measure and provide electricity to customers.
>
> 12. Step-down transformers were equipment installed in customer areas or neighborhoods—either on a utility pole or underground—to reduce the voltage of the electricity entering a customer's location, making it useable for a customer's purposes.
>
> 13. Customer meters were physically connected to step-down transformers by wire.
>
> 14. Customer meters were installed at customer locations to measure customers' electricity consumption. Customer meters also had several other functions that allowed them to interact with the step-down transformers.
>
> 15. Customer meters have telemetry functionality that allowed them to collect customer consumption data in kilowatt hours. Information collected and transmitted from the customer meters was used collectively to analyze the step-down transformers' performance, maintenance, and safety requirements.
>
> 16. Customer meters then transmitted those metrics to EPE personnel using cellular technology or automated meter reading (AMR). The communications technology removed the need for someone to physically interact with the telemetry unit to read the usage data.

The trial court's conclusions of law include "EPE's purchase and use of customer meters and substation meters are exempt from Texas sales tax under Tex. Tax Code § 151.318(a)(4) as 'telemetry units that are related to . . . step-down transformer[s].'" The Comptroller's appeal followed.

8

## ANALYSIS

On appeal, the Comptroller challenges the trial court's subject matter jurisdiction to consider EPE's refund claims, but he does not challenge the trial court's conclusion that the transactions involving the substation meters were tax exempt under the manufacturing exemption. Thus, the transactions involving the customer meters are the only transactions in dispute on appeal if we determine that the trial court had subject matter jurisdiction over EPE's refund claims.[5] In this context, we turn to the Comptroller's issues, beginning with his challenge to the trial court's subject matter jurisdiction.

### Subject Matter Jurisdiction

In his first issue, the Comptroller challenges the trial court's denial of his plea to the jurisdiction.[6] He argues that the trial court did not have jurisdiction over EPE's refund claims because EPE "failed to timely assert its claim with the specificity required" by the Tax Code and relies on Section 111.104(c) of the Tax Code and the Comptroller rule setting the

---

[5] EPE did not file an appeal and therefore does not challenge the portion of the trial court's judgment denying its refund claims as to the sales taxes paid on the transactions involving the collars.

[6] EPE argues that the Comptroller may not raise his jurisdictional challenge at this juncture and that he should have timely brought an interlocutory appeal from the denial of his plea to the jurisdiction. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) (providing for interlocutory appeal from denial of governmental unit's plea to jurisdiction); Tex. R. App. P. 26.1(b) (providing deadline for filing notice of appeal when accelerated), 28.1 (providing that interlocutory appeals are accelerated). The Texas Supreme Court, however, has made clear that "a party does not forfeit its right to challenge a ruling on appeal from a final judgment simply by opting not to pursue an interlocutory appeal of that ruling." *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 387 (Tex. 2020). Further, challenges to subject matter jurisdiction may be raised for the first time on appeal. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993). Thus, we conclude that the Comptroller's first issue is properly before us.

9

deadline for amending statements of grounds. *See* Tex. Tax Code § 111.104(c); 34 Tex. Admin. Code § 1.11.

*Standard of Review*

A plea to the jurisdiction is among the procedural mechanisms through which a party may challenge a trial court's authority to decide the subject matter of a specific cause of action. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A plea challenging the trial court's subject matter jurisdiction raises a question of law that we review de novo. *Id.* "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts," as is the case here, "we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id.* at 227 (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)); *see also Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012) (describing plea to jurisdiction practice when challenge is to existence of jurisdictional facts and explaining that "trial court's review of a plea to the jurisdiction mirrors that of a traditional motion for summary judgment" (citing *Miranda*, 133 S.W.3d at 228)).

The Comptroller's challenge to the trial court's jurisdiction also involves statutory construction, a question of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008). Our primary concern in construing a statute is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "We thus construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of*

10

*Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). We also "read the statute as a whole and interpret it to give effect to every part." *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)); *see Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010) (explaining that courts "presume the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind"). Further, a precondition to deference to an agency's interpretation of a statute is ambiguity. *Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404–05 (Tex. 2016).

*Section 111.104(c)*

Among the jurisdictional prerequisites for bringing a tax refund suit is compliance with Section 111.004(c) of the Tax Code. *See* Tex. Tax Code § 112.151 (requiring claimant to follow administrative procedures specified in Sections 111.104 and 111.105 of Tax Code as prerequisite to bringing suit for tax refund claim); *see also Combs v. Chevron, Inc.*, 319 S.W.3d 836, 844 (Tex. App.—Austin 2010, pet. denied) (explaining that compliance with procedural requirements of tax protest law was jurisdictional prerequisite for trial court to hear and decide merits of tax refund suit).[7] Subsection 111.104(c)(2) states that a claim for refund must "state fully and in detail each reason or ground on which the claim is founded." Tex. Tax Code § 111.104(c)(2).

---

[7] The Comptroller does not dispute that EPE complied with Section 111.105(d) of the Tax Code by raising the manufacturing exemption in its motion for rehearing as to the transactions in question. *See* Tex. Tax Code § 111.105(d) (stating that motion for rehearing on tax refund claim "must be written and assert each specific ground of error"); *see also id.* § 112.152 (limiting issues in suit brought under subchapter to "grounds of error contained in the motion for rehearing").

This Court has concluded that the statutory language in Subsection (c)(2) is not ambiguous and interpreted its plain language in context and conjunction with other sections of the Tax Code that contain similar language. *See Hegar v. Ryan, LLC*, No. 03-13-00400-CV, 2015 Tex. App. LEXIS 5096, at *25–28 (Tex. App.—Austin May 20, 2015, no pet.) (mem. op.) (concluding that Subsection 111.104(c)(2) was not ambiguous, citing common meaning of "reason," "fully," "detail," and "ground," and interpreting plain language in context and conjunction with other sections of Tax Code that contain similar language); *see also Scott*, 309 S.W.3d at 930–31 & n.3 (noting that generally substantially same phrases in statutes on same subject matter will have same meaning). We concluded that "[t]he plain language of the requirements of Subsection (c)(2) are satisfied when the ground—the legal foundation or basis— of the claim is stated 'fully and in detail.'" *Ryan*, 2015 Tex. App. LEXIS 5096, at *27. We interpreted the phrase to require the taxpayer to state the "reason or ground" in such a way as to put the Comptroller on notice of the legal basis of the claim. *See id.* at *28–31 (comparing language in Subsection 111.104(c) with similar language in other sections).

As support for his position that EPE "failed to timely assert its claim with the specificity required by the Tax Code," the Comptroller relies on his rule that sets the deadline for amending statements of grounds. *See* 34 Tex. Admin. Code § 1.11. The Comptroller argues that "[t]he Court should find that [EPE]'s failure to comply with [the Comptroller rule] deadline was a failure to comply with the 'fully and in detail' requirement of Tax Code section 111.104." The Comptroller's position, however, conflates the requirements under his procedural rules with the Tax Code's jurisdictional requirements for bringing a tax refund suit. *See* Tex. Tax Code § 112.151; *Chevron*, 319 S.W.3d at 844 (explaining that compliance with sections 111.104 and 111.105 of Tax Code creates trial court jurisdiction over tax refund claim). We decline the

Comptroller's invitation to impose jurisdictional requirements that are not in the statute. *Cf., e.g.*, *Ryan,* 2015 Tex. App. LEXIS 5096, at *35 (concluding in context of rule challenge that rules were invalid that imposed "'additional burdens, conditions, or restrictions in excess of or inconsistent with' subsection 111.104(c) and the overall statutory scheme" (citation omitted)).

The Comptroller does not dispute that beginning with EPE's initial claims for refund he was on notice that EPE was seeking a refund based on the manufacturing exemption pursuant to section 151.318 as to each of the transactions in question. *See Silicon Labs., Inc.*, 2018 Tex. App. LEXIS 5323, at *13–16 (explaining that specificity requirements of Subsection 111.104(c) provide notice to Comptroller of legal basis of claim); *Ryan*, 2015 Tex. App. LEXIS 5096, at *25–31 (same). EPE expressly referenced the manufacturing exemption and quoted Section 151.318, including Subsection (a)(4), in its statements of grounds and provided further notice in its accompanying schedules that it was seeking a refund based on the manufacturing exemption as to each of the specifically identified transactions. *See* 34 Tex. Admin. Code § 1.11(a) (addressing required content of statement of grounds). The schedules identify the specific transactions by line items that include detailed information about the particular transaction including dates, invoice numbers, and amounts—and when applicable, that the item involved in the transaction was a "meter"—and specifically refer to the manufacturing exemption—such as by listing "mfg. equip.—100% exempt"—and section 151.318, as well as the applicable Comptroller rule. The Comptroller also does not dispute that he was on notice during the administrative proceedings that EPE was claiming that the transactions in question were exempt because the meters and collars were "telemetry units that are related to the step-down transformers." *See* Tex. Tax Code § 151.318(a)(4); *Ryan*, 2015 Tex. App. LEXIS 5096, at *31 (observing that "statutory scheme, from the filing of a refund claim to a suit for refund, is

13

designed so that the Comptroller is aware of the legal basis for the refund claim but then gives the taxpayer a period of time to prove its claim").

Applying the plain language of the unambiguous statute and consistent with our precedent, we conclude that EPE's claims for tax refund based on the manufacturing exemption satisfied the requirements of Subsection 111.104(c)(2). *See Silicon Labs., Inc*, 2018 Tex. App. LEXIS 5323, at *13–16; *Ryan*, 2015 Tex. App. LEXIS 5096, at *25–31; *see also In re Nestle, USA, Inc.*, 359 S.W.3d 207, 208–09 (Tex. 2012) (orig. proceeding) (generally discussing requirements of protest letter); *H.K. Global Trading, Ltd. v. Combs*, 429 S.W.3d 132, 136 (Tex. App.—Austin 2014, pet. denied) (concluding that protest letter was sufficient to invoke trial court's jurisdiction); *Combs v. Health Care Servs. Corp.*, No. 03-09-00617-CV, 2011 Tex. App. LEXIS 2081, at *43–45 (Tex. App.—Austin Mar. 16, 2011) (mem. op.) (concluding that motion for rehearing was sufficiently definite to identify refund claim based on sales-tax exemptions made for and resold to federal government), *aff'd in part and rev'd in part on other grounds*, 401 S.W.3d 623 (Tex. 2013); *cf. Chevron*, 319 S.W.3d at 844–45 (concluding that trial court lacked jurisdiction over "98 new, unrelated claims" that taxpayer raised for first time in motion for rehearing); *Local Neon Co. v. Strayhorn*, No. 03-04-00261-CV, 2005 Tex. App. LEXIS 4667, at *13–15 (Tex. App.—Austin June 16, 2005, no pet.) (mem. op.) (discussing specificity requirement for protest letters and concluding that "bare statement" that taxes were paid under protest "did not satisfy the purpose of the written protest requirement because the letter does not inform the Comptroller on what basis she must defend the suit"). Thus, we conclude that the trial court had subject matter jurisdiction over EPE's refund claims and overrule the Comptroller's first issue.

14

**Customer Meters**

In his second issue, the Comptroller argues that the trial court erred when it awarded a refund to EPE pursuant to the manufacturing exemption on the transactions involving the customer meters.

*Standard of Review*

In an appeal from a bench trial, we review a trial court's conclusions of law de novo, affirming the judgment on any legal theory that finds support in the evidence. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). Further, when findings of fact are filed and unchallenged, "[t]hey are binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *see Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (explaining that appellate court reviews trial court's findings of fact for legal and factual sufficiency of evidence by same standards applied to jury verdict).

The Comptroller's second issue also concerns statutory construction, specifically the scope and meaning of the manufacturing exemption. Statutory exemptions from taxation are strictly construed because "they undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally." *North Alamo Water Supply Corp. v. Willacy Cnty. Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991); *see also Southwest Royalties, Inc.*, 500 S.W.3d at 404 (explaining that tax exemptions are narrowly construed and that taxpayer has burden to "clearly show" that exemption applies). "Although statutory tax exemptions are narrowly construed, construing

15

them narrowly does not mean disregarding the words used by the Legislature." *Southwest Royalties, Inc.*, 500 S.W.3d at 404. Further, "[t]he concept that a tax exemption must be 'strictly' construed 'cannot be used as an excuse to stray from reasonableness.'" *GTE Sw. Inc.*, 2010 Tex. App. LEXIS 4223, at *7 (citing *Sharp v. Tyler Pipe Indus., Inc.*, 919 S.W.2d 157, 161 (Tex. App.—Austin 1996, writ denied)).

*Are the customer meters exempt pursuant to the manufacturing exemption?*

The trial court concluded that the customer meters were exempt pursuant to the manufacturing exemption, concluding that:

> 4.      EPE's purchase and use of customer meters . . . are exempt from Texas sales tax under Tex. Tax Code § 151.318(a)(4) as "telemetry units that are related to . . . step down transformers."
>
> . . .
>
> 6.      The phrase "related to" is read broadly under Texas law.
>
> 7.      The customer meters . . . were related to the step-down transformers by providing data to EPE personnel about the operation and functionality of the step-down transformers.
>
> 8.      EPE used the telemetry data from the customer meters . . . to make necessary maintenance and repairs to its step-down transformers.

The Comptroller does not dispute that the customer meters have "telemetry capability" and are "telemetry units"[8] within the meaning of Subsection 151.318(a)(4) but argues that "they are not related to step-down transformers as described in the Tax Code." *See* Tex. Tax Code § 151.318(a)(4) (exempting "telemetry units that are related to the step-down

---

[8] The parties substantially agree on the meaning of a "telemetry unit." The Comptroller defines a "telemetry unit" as "a device that telecommunicates measurements," and EPE defines it as "a device that measures and transmits the measurements to another device."

16

transformers"). He argues that this Court should defer to his statutory interpretation in this case and "use a narrow construction [of 'related to'], which would require the customer meters to directly measure the output of the step-down transformers" and that, in context, "the only reasonable interpretation of the statute is that the telemetry unit must telecommunicate the metrics of step-down transformers." Otherwise, the Comptroller argues, every meter on an electric generating and transmission grid would qualify for the manufacturing exemption because the meters "would not register any electricity consumption unless all the other elements of the system were functioning" and "the Legislature intended that only certain telemetry units are exempt." In the Comptroller's view, for a meter to qualify, it "should be dedicated to a step-down transformer and it should telecommunicate the input or output metrics of the transformer itself." The Comptroller also relies on other specified devices that qualify for the manufacturing exemption, such as "capacitor banks" and "instrument transformers," as support for his position that the "relationship must be more than mere interconnection" and argues that if "mere wire was enough to satisfy the term 'related,' [the Legislature] would have stated so" as it did with respect to step-up transformers.

We begin our analysis by observing that the phrase "related to" in Subsection 151.318(a)(4) is not defined in the statute. *See id.* § 151.318(a)(4). Nor is the phrase ambiguous, and we therefore construe it based on its plain and common meaning. *See Scott*, 309 S.W.3d at 930. "In ordinary use, 'relates to' means to have a connection with, to refer to, or to concern." *Texas Dep't of Public Safety v. Abbott*, 310 S.W.3d 670, 674–675 & n.2 (Tex. App.—Austin 2010, no pet.) (citing definition of "relate" in *Black's Law Dictionary* 1288 (6th ed. 1990)); *see Scott*, 309 S.W.3d at 930. As recognized by the trial court in its conclusions of law, this phrase is "very broad in its ordinary usage, and we must presume that the legislature used such a broad

17

formulation purposely." *See Abbott*, 310 S.W.3d at 674–75; *see also Colorado v. Tyco Valves & Controls, L.P.*, 432 S.W.3d 885, 890 (Tex. 2014) (applying broad definition of "relates to"). We, however, need not decide the breadth of the phrase "related to" in the context of Subsection 151.318(a)(4) because we conclude that the phrase's meaning is broad enough to encompass the relation between the customer meters and the step-down transformers as found by the trial court in its unchallenged findings of fact. *See McGalliard*, 722 S.W.2d at 696 (explaining that generally unchallenged findings are binding on appellate court).

The trial court's unchallenged findings included that the customer meters: (i) were "part of a local network that were connected to local stepdown transformers," (ii) "were physically connected to step-down transformers by wire," (iii) "had several other functions that allowed them to interact with the step-down transformers," and (iv) "have telemetry functionality that allowed them to collect customer consumption data in kilowatt hours" and "[i]nformation collected and transmitted from the customer meters was used collectively to analyze the step-down transformers' performance, maintenance, and safety requirements." The trial court also found that the customer meters "transmitted those metrics to EPE personnel using cellular technology or automated meter reading (AMR)" and that "the communications technology removed the need for someone to physically interact with the telemetry unit to read the usage data." These unchallenged findings support the trial court's conclusion that the customer meters "are related to the step-down transformers" and, thus, that the transactions involving the customer meters were exempt from taxation under the manufacturing exemption.

Based on his proposed interpretation of the phrase "related to," the Comptroller argues that the customer meters are not related to the step-down transformers because the meters relay metrics about customer usage and not step-down transformers, citing the metering

18

supervisor's testimony that the meters "do not measure a transformer's output at the transformer" and that the meters are the "cash registers of the company" because they measure the amount of energy a customer is using to generate an energy bill. We, however, decline to adopt the Comptroller's interpretation that would require the customer meters to communicate certain information about a step-down transformer in order to be "related to" the transformer because it would require us to engraft extra-statutory requirements. *See Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013) (observing that "provisions do not impose, either explicitly or implicitly, any such extra-statutory requirement" and "declin[ing] to engraft one—revising the statute under the guise of interpreting it"); *see also Southwest Royalties, Inc.*, 500 S.W.3d at 404 (explaining that narrowly construing statutory tax exemptions "does not mean disregarding the words used by the Legislature"); *GTE Sw. Inc.*, 2010 Tex. App. LEXIS 4223, at *7 (stating that concept that tax exemption must be strictly construed cannot be used as excuse to stray from reasonableness).

Further, consistent with the trial court's unchallenged findings, the supervisor provided evidence of a substantial relation between the customer meters and the step-down transformers in their local networks. *See Colorado*, 432 S.W.3d at 890 (discussing U.S. Supreme Court's construction of phrase "relates to" that required relation not to be "too tenuous, remote, or peripheral" (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 & n.2 (1983))). The supervisor testified that the customer meters "are tied downstream to the step-down transformer in series with the point of delivery that it's going to serve" and answered "Yes" when asked if the customer meters are part of "a designed system to work together with the step-down transformer" and if they were "specific to a particular step-down transformer." He explained the design or "dedication" as follows:

Well, if you have one step-down transformer, you could have one customer or you could have fifteen customers on it. So we have to run different lines to a customer's premise, and we put a meter in each one. You have to be built for the power that you're using not for what somebody else is using.

But in order to determine what that transformer and the performance of that transformer is doing, we have to be able to take those meters and be able to add up the summation of them—whether it's voltage, whether it's current, whatever— and be able to determine the performance of that transformer. So all of those meters on that circuit are tied back to that one step-down transformer.

Applying the plain meaning of "related to" in context, we conclude that the trial court's unchallenged findings, as well as the evidence, establish that the customer meters were "related to" step-down transformers and support the trial court's conclusions that the manufacturing exemption applied to the transactions involving the customer meters. *See BMC Software Belg.*, 83 S.W.3d at 794; *McGalliard*, 722 S.W.2d at 696. Thus, we overrule the Comptroller's second issue.

## CONCLUSION

Having overruled the Comptroller's issues, we affirm the trial court's judgment.

_____
Melissa Goodwin, Justice

Before Chief Justice Byrne, Justices Goodwin, Baker, Triana, Kelly, and Smith
  Dissenting Opinion by Justice Kelly, joined by Justice Smith

Affirmed on Motion for Reconsideration En Banc

Filed: March 5, 2021

20