# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-0743
════════════

SOUTHWEST ROYALTIES, INC., PETITIONER,

v.

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS,
AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS, RESPONDENTS

═══════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════════════

**Argued March 8, 2016**

JUSTICE JOHNSON delivered the opinion of the Court.

The question in this tax-refund case is whether an oil and gas exploration and production company proved that its purchases of casing, tubing, other well equipment, and associated services were exempt from sales taxes under a statutory exemption. The trial court found that the company did not prove it was entitled to the exemption. The court of appeals affirmed. We likewise affirm.

## I. Background

Southwest Royalties, Inc. is an oil and gas exploration and production company. It purchased and paid sales taxes on equipment, materials, and associated services related to its oil and gas production operations for the period from January 1, 1997, to April 30, 2001. In 2009, Southwest

filed a tax refund claim with the Comptroller,[1] asserting it was entitled to an exemption from the tax for some of the equipment such as casing, tubing, and pumps (collectively, equipment), together with associated services. *See* TEX. TAX CODE §111.104 (providing for filing a tax refund claim with the comptroller). It based its claim on the following Tax Code provisions:

**Property Used in Manufacturing**

(a) The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer:

. . .

(2) tangible personal property directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to:
    (A) the product being manufactured, processed, or fabricated for ultimate sale; or
    (B) any intermediate or preliminary product that will become an ingredient or component part of the product being manufactured, processed, or fabricated for ultimate sale;

. . .

(5) tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a pollution control process;

. . .

(10) tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal

---

[1] Susan Combs was comptroller at the time suit was filed. Glenn Hegar succeeded her and has been substituted as comptroller. *See* TEX. R. APP. P. 7.2(a).

> property for ultimate sale if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health.

*Id.* § 151.318.

Southwest sought the refund on the basis that the equipment was used in or during the process of extracting oil, gas, and associated substances (collectively, hydrocarbons), from underground mineral reservoirs, separating the hydrocarbons into their component substances, and bringing them to the surface. The Comptroller denied relief, noting a previous determination that the type of equipment in question was used for transportation, not manufacturing. Comptroller Hearing 100,619 (2009). After its motion for rehearing was denied, Southwest sued the Comptroller and the Attorney General (collectively, the State). *See* Tex. Tax Code § 112.151.

In its suit, Southwest asserted that hydrocarbons extracted from an underground reservoir must be separated into their component parts to produce saleable products, and the equipment for which it sought refunds was used in "processing" the hydrocarbons as they were extracted from the reservoir and brought to the surface, that is, it was used in separating the hydrocarbons into their different components. The State countered that Southwest was not entitled to the exemption because oil and gas exploration companies are not manufacturers and because extracting minerals and bringing them to the surface is not manufacturing.

Following a bench trial, the trial court found that physical changes occur in hydrocarbons when they are extracted from their underground reservoir and lifted to the surface. But it also found that Southwest's equipment was not the direct cause of the changes; rather, the changes were directly caused by temperature and pressure changes as the hydrocarbons moved upward toward the surface.

3

The court concluded that Southwest failed to meet its burden to prove the exemption applied, and rendered judgment for the State.[2] Southwest does not challenge any of the trial court's findings of fact.

---

[2] Salient findings of fact and conclusions of law made by the trial court are set out below:

## I. FINDINGS OF FACT

6. The term "petroleum" as used by this Court includes not only crude oil, but all liquid and gaseous hydrocarbon constituents in an oil and gas reservoir beneath the surface of the ground.

7. The difference in pressure between the oil and gas reservoir beneath the ground and the surface causes some lighter hydrocarbon constituents in the petroleum to change from a liquid state to a gaseous state as the petroleum is lifted toward the surface with the result that Plaintiff recovers oil and gas.

8. Liquid petroleum lifted from a reservoir has many hydrocarbon constituents, but only some of the lighter constituents, such as methane, may become gas as a result of the change in pressure as the petroleum is lifted from the oil and gas reservoir beneath the ground to the surface.

10. The temperature difference between the oil and gas reservoir beneath the ground and the surface causes some hydrocarbon constituents in the petroleum to condense from a gaseous state and become liquid petroleum.

12. The physical changes of state from liquid to gas and gas to liquid are directly caused by differences in pressure and temperature that result from lifting the petroleum to the surface.

13. The change of pressure and temperature intervenes to directly cause some, but not all, of the hydrocarbon constituents in the petroleum to change from either a liquid to a gas, or a gas to a liquid, beneath the surface of the ground.

14. The Equipment is merely an indirect cause of the changes in physical state that occurs to some of the hydrocarbon constituents in the petroleum.

## II. CONCLUSIONS OF LAW

2. Changes from liquid to gas and from gas to liquid are "physical changes" within the meaning of Tex. Tax Code § 151.318.

3. Physical change occurs when petroleum is brought to the surface of the ground.

4. Proof that a physical change has occurred to petroleum when it is brought to the surface is insufficient to establish that the manufacturing exemption in Tex. Tax Code § 151.318 applies because what must be shown is that the Equipment directly causes the physical change to the petroleum.

5. "Direct" implies a close link with no intervening causes.

6. The direct cause of the physical change is the change in pressure and/or temperature.

7. The Equipment is merely an indirect cause of the physical changes.

4

Southwest appealed. The appeals court determined that the statute is ambiguous regarding "what qualifies as property or services used during 'actual manufacturing, processing, or fabrication'" under the Tax Code. ___ S.W.3d ___, ___ (Tex. App.—Austin 2014). Deferring to the agency's interpretation of the statute because of this ambiguity, the court held that the Comptroller's interpretation—that the Legislature did not intend the manufacturing exemption to apply to the extraction of oil and gas—was not plainly erroneous or inconsistent with the statutory language. *Id.* It affirmed.

In this Court, Southwest asserts that (1) hydrocarbons are tangible personal property once they are severed from the reservoir and pass into the casing in the wellbore, and (2) it proved its equipment was used for "processing" because it was used in separating the hydrocarbons into their component parts.[3] Southwest also claims that despite the court of appeals' determination, the statute is unambiguous and this Court should not defer to the Comptroller's interpretation. Finally, Southwest asserts that the exemption applies because the equipment is used in processing and is essential for controlling pollution, *see* TEX. TAX CODE § 151.318(a)(5), and for compliance with public-health laws. *See id.* § 151.318(a)(10).

The State counters that (1) the manufacturing exemption must be construed narrowly with any doubts resolved against Southwest; (2) construing the exemption narrowly yields the conclusion that mineral extraction is not "manufacturing," "processing," or "fabrication"; and (3) construing the statute otherwise is inconsistent with other provisions of the Tax Code. Further, the State asserts that

---

[3] Amicus briefs were submitted in support of Southwest's position by Texas Association of Business, Texas Aggregates and Concrete Association, and Texas Mining and Reclamation Association; EOG Resources; Texas Oil and Gas Association; and the Texas Public Policy Foundation.

5

even if extraction is processing, the changes the hydrocarbons undergo during their movement to the surface are directly caused by natural pressure and temperature changes, not Southwest's equipment. The State also argues that the exemption is inapplicable because minerals below the surface are real property, not "tangible personal property," under the Tax Code, even if they have been severed from the reservoir and are inside well casing and tubing.

## II. Discussion

### A. Standard of Review

Statutory construction is a question of law that we review *de novo*. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008). Our primary objective is to give effect to the Legislature's intent, which we ascertain from the plain meaning of the words used in the statute, if possible. *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). Tax exemptions are narrowly construed and the taxpayer has the burden to "clearly show" that an exemption applies. *See* TEX. TAX CODE § 151.318(r); *Bullock v. Nat'l Bancshares Corp.*, 584 S.W.2d 268, 271-72 (Tex. 1979). Although statutory tax exemptions are narrowly construed, construing them narrowly does not mean disregarding the words used by the Legislature. *See AHF-Arbors at Huntsville I, LLC v. Walker Cty. Appraisal Dist.*, 410 S.W.3d 831, 837 (Tex. 2012).

The State asserts that we should afford deference to the Comptroller's interpretation of the manufacturing exemption because "the construction is reasonable and does not contradict the plain language of the statute." *First Am. Title Ins. Co.*, 258 S.W.3d at 632. In that vein, we have long recognized that an agency's construction of a statute may be taken into consideration by courts when interpreting statutes, but *deferring* to an agency's construction is appropriate only when the statutory

6

language is ambiguous. *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2001). In *Texas Citizens for a Safe Future* we explained that judicial deference to an agency's construction of a statute is tempered by several considerations, including that "the language at issue must be ambiguous." *Id.* (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747-48 (Tex. 2006)); *see Tracfone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex. 2013) ("[C]ourts sometimes defer to agencies' statutory interpretations, but only when a statute is ambiguous . . . . Agency deference has no place when statutes are unambiguous—the law means what it says—meaning we will not credit a contrary agency interpretation that departs from the clear meaning of the statutory language."). With the foregoing in mind, we turn to the language of the statute.

## B. Is the Statute Ambiguous?

The statute provides that the sales tax exemption applies to tangible personal property used in "the actual manufacturing, processing, or fabrication of tangible personal property." TEX. TAX CODE § 151.318(a)(2), (5), (10). The main disagreement between the parties is whether the equipment is used for "processing," and neither argues that the term is ambiguous. However, the fact that the parties do not contend a statute is ambiguous does not mean that it is not. Whether statutory language is ambiguous is a matter of law for courts to decide, and language is ambiguous only if the words yield more than one reasonable interpretation. *See Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013); *Tex. Citizens for a Safe Future*, 336 S.W.3d at 628 ("It is precisely when a statutory term is *subject to multiple understandings* that we should defer to an agency's reasonable interpretation." (emphasis added)).

7

When a statute contains a term that is undefined, as "processing" is in this case, the term is typically given its ordinary meaning. *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013). But the meaning must be in harmony and consistent with other statutory terms and "[i]f a different, more limited, or precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *Id.* If an undefined term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme. *See Thompson v. Tex. Dep't Licensing & Regulation*, 455 S.W.3d 569, 571 (Tex. 2014).

Here the three words "manufacturing," "processing," and "fabrication" are found in a section entitled "Property Used in Manufacturing." TEX. TAX CODE § 151.318. Southwest recognizes that "processing" may sometimes be encompassed within "manufacturing," as the State asserts, but argues that "processing" as used in the statute must refer to something different from "manufacturing" and "fabrication," otherwise it is surplusage. Citing various dictionary definitions, Southwest argues that "processing" as used in the statute involves "creating or inducing a physical change" in the tangible personal property being processed, and "processing" of hydrocarbons need not be "manufacturing" to come within the exemption provided by section 151.318. We agree with Southwest. While manufacturing may well include types of "processing," the use of the separate term "processing" in the statute indicates the Legislature understood and intended that "processing" includes matters outside the confines of "manufacturing." In this regard, the Comptroller has defined "processing" as it is used in section 151.318 as being "[t]he physical application of the materials and labor necessary to modify or change the characteristics of tangible personal property." 34 TEX.

8

ADMIN. CODE § 3.300(a)(10). The State asserts that even if "processing" is not encompassed within "manufacturing," this definition applies. Although the Comptroller's definition is not binding, we may consider it in determining the definition most consistent with the scheme of the statute, just as we may look to other aids for construing statutory language. *See $1,760.00 in U.S. Currency*, 406 S.W.3d at 181; *Firestone Tire & Rubber Co. v. Bullock*, 573 S.W.2d 498, 500 n.3 (noting that the Comptroller's definition will not be effective to expand or contract the language of the statute).

The definitions cited by, and the interpretation proposed by, Southwest, as well as the Comptroller's definition, are consistent with the other text of the statute. Even though there may be shades of difference in various definitions of "processing," we think the differences are immaterial when the term is considered in context of the framework of section 151.318. *See Thompson*, 455 S.W.3d at 571. The essence of all the common meanings of "processing" correlate with the definition adopted by the Comptroller.

The State asserts that there may be an ambiguity about "the scope" of the exemption. But the inquiry is not whether the scope of a statute is ambiguous, but rather whether the statutory language itself is ambiguous. *Tex. Dep't of Ins. v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 853-54 (Tex. 2011) ("An administrative agency's construction of a statute it implements ordinarily warrants deference when . . . *the statutory language at issue* is ambiguous.") (emphasis added); *see Thompson*, 455 S.W.3d at 572 (considering the statutory phrase "evidence of the person's rehabilitation or rehabilitative effort while incarcerated or after release" to determine whether the language was ambiguous before considering whether it included the requirements urged by the Department of Licensing and Regulation).

9

Because, in context, the statutory language is not subject to multiple understandings, we agree with the parties that it is not ambiguous. The Legislature intended "processing" in subsections 151.318(a)(2), (5), and (10) to mean the application of materials and labor necessary to modify or change characteristics of tangible personal property.

## C. Is the Equipment Used in Processing?

The three Tax Code subsections under which Southwest sought an exemption require that the property at issue be used in actual "processing"—application of materials and labor necessary to modify or change the characteristics of tangible personal property. *See* TEX. TAX CODE § 151.318 (a)(2), (5), (10); 34 TEX. ADMIN. CODE § 3.300(a)(10). As noted previously, it is undisputed that hydrocarbons undergo physical changes as they move from underground reservoirs to the surface; the disagreement is about the role Southwest's equipment plays in those changes.

Hydrocarbons generally reside within porous formations or reservoirs of rock under great pressure from the overlaying earth. 2 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[B][1], at 8-22.5. When a well penetrates and is completed in the reservoir, the differential between the pressure inside the wellbore and the pressure on hydrocarbons in the formation causes the hydrocarbons to flow out of the formation and into the well. *Id.* The casing for which Southwest sought the exemption is a steel pipe that is inserted into a borehole that keeps the borehole from collapsing. Portions of the casing are cemented into place. The tubing for which Southwest also sought an exemption is a smaller tube that hangs inside the casing. Most of the hydrocarbon fluids will flow to the surface through the tubing while gas separated from the fluids generally moves into and up the space between the tubing and the casing. As the hydrocarbons flow

10

into and up the casing and tubing, the changing pressure and temperature result in their separating into gas and liquids.

Southwest argues that the casing and tubing system both begins and continues the "processing" of hydrocarbons into separate substances of oil, gas, and condensates. But the trial court found that the direct causes of the changes in the hydrocarbons were pressure and temperature changes, while the equipment was only an indirect cause of them. And the evidence supporting those findings is not challenged by Southwest. For example, Robert Newton, the Permian Basin division manager for Clayton Williams Energy (the owner of Southwest Royalties) testified that the wells begin the process of separating the hydrocarbons into gas and liquid by creating a pressure drawdown and bringing the hydrocarbons into the wellbore, which then separates them. He later explained, however, that the casing maintains, but does not cause, pressure, and if hydrocarbons enter an uncased borehole and move toward the surface, they exhibit the same physical changes. Terry Payne, a petroleum engineer, testified for Southwest that the wells were the cause of the change to the hydrocarbons because without them the hydrocarbons would stay in the ground. But he also testified that the phase changes the hydrocarbons undergo result from changes in pressure and temperature. Thomas Richter, a petroleum engineer, testified for the State that the phase changes were a natural, physical process that occurs from the reservoir to the top of a well and whether casing was in the well was only incidental to the changes. He explained that the casing and tubing were essentially only conduits through which the hydrocarbons exit the reservoir and proceed to the surface. No evidence identified any way Southwest's equipment acted upon the hydrocarbons

11

to cause a modification or change in them other than by being the vehicle through which they exited the underground formation and traveled to the surface.

While the parties and *amici* argue extensively over whether oil and gas production generally is processing, our inquiry is more narrow; it is whether the equipment for which Southwest is seeking an exemption was used in the actual physical application of materials and labor to the hydrocarbons that was necessary to cause, and caused, a physical change to them. "Used" and "actual" are not defined in the statute so we look to their common, ordinary meanings. *$1,760.00 in U.S. Currency*, 406 S.W.3d at 180. "Used" is defined as "employed in accomplishing something," and "actual" is defined as "existing in act and not merely potentially." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 12, 1297 (10th ed. 2000). While the equipment unquestionably was both used in and necessary to the efficient recovery of hydrocarbons from their reservoirs, there is no evidence that the equipment acted upon the hydrocarbons to modify or change their characteristics. The changes in the substances were caused not by the application of equipment and materials to them, but by the natural pressure and temperature changes that occurred as the hydrocarbons traveled from the reservoir through the casing and tubing to the surface.

Both parties rely on lower court decisions interpreting terms in Tax Code section 151.318. Those cases are consistent with our conclusion. In *Rylander v. Haber Fabrics Corp.*, Haber Fabrics challenged the Comptroller's decision that Haber did not "process" second quality fabric by sorting, airing, inspecting, cutting, and packaging it to be first quality grade. 13 S.W.3d 845, 848 (Tex. App.—Austin 2000, no pet.). The trial court agreed with Haber, and the court of appeals affirmed. *Id.* at 847. The court of appeals held that Haber's activities satisfied the Comptroller's definition of

12

processing because Haber "applies materials and labor to modify or change the characteristics of the fabric." *Id.* Here, in contrast, while Southwest applied the equipment to move substances from underground reservoirs to the surface, it did not apply the equipment to modify or change their characteristics. Rather, as the trial court found, inherent characteristics of the hydrocarbons and natural forces of changing pressures and temperatures caused the changes.

In *Sabine Mining Co. v. Strayhorn*, the court considered whether "dragline" machines were property used in manufacturing and, therefore, exempt from sales tax. 2007 WL 2390686 (Tex. App.—Corpus Christi 2007, no pet.) (mem. op.). The company seeking the exemption, Sabine Mining, used the draglines to remove overburden—a layer of dirt and rock—from atop underground coal deposits. *Id.* at *1. The removal of the overburden reduced weight and pressure on the coal and exposed it to oxygen which caused fracturing. *Id.* These changes altered the physical appearance of the coal and also increased its energy content. *Id.* The court concluded that the changes to the coal were not a "direct" result of the draglines. *Id.* at *3. The court explained that a reasonable interpretation of "direct" implies a close link with no intervening causes, and the dragline was merely an "indirect" cause of the changes. *Id.* at *4. This is similar to the situation here where natural pressure and temperature changes are, as the trial court found, the direct causes of the changes to the hydrocarbons and the equipment was an indirect cause.

Southwest also asserts that in two other matters the Comptroller has granted exemptions for equipment used in oil and gas extraction and mineral operations. But in neither of those matters did the Comptroller conclude that bringing oil and gas to the surface, without additional affirmative action using property to effect changes in their characteristics, was "processing." *See* Comptroller

13

Hearing 31,253 (1998) ("It has long been the position of the Agency that the act of bringing oil to the surface of the earth is not processing . . . . [W]e have concluded that injecting carbon dioxide for the purpose of thinning or increasing the gravity of the oil creates a physical change in the oil and is, therefore, a processing activity."); Comptroller Letter Ruling 200903457L (2009) ("Although the act of producing oil or gas (bringing oil or gas to the surface of the earth) is not processing[,] the use of liquid carbon dioxide ($CO_2$) to thin or increase the gravity of crude oil causes a physical change in the oil and thus constitutes processing for sales and use tax purposes.").

Southwest also cites Comptroller decisions that determined processing occurred below ground, but these decisions are inapposite. Our decision does not turn on the fact that the alleged processing occurred underground as opposed to above ground. Rather, it turns on the fact that the trial court did not find, and there is no evidence that, the equipment was applied to cause changes in their characteristics as the hydrocarbons moved from the reservoir to the surface. *See* Comptroller Hearing 31,842 (2004) (finding that pumping superheated water into sulphur formations caused a physical or chemical change in the sulphur); Comptroller Letter Ruling 9506L1351F01 (1995) (finding that equipment used to break apart the ground and shatter the underlying limestone and shale into pieces to be processed into cement qualified as manufacturing equipment); Comptroller Hearing 27,940 (1992) (concluding that explosives used to blast rock and sandstone formations were used in processing gravel and sand); Comptroller Hearing 23,055 (1988) (determining that dynamite used to blast rock out of the earth and start reducing the size of large boulders to gravel was exempt). And regardless of the Comptroller's prior interpretations, the question here is one of statutory

14

construction which "ultimately is one left to the courts." *Roark Amusement & Vending*, 422 S.W.3d at 638.

### III. Conclusion

Southwest did not prove that the equipment for which it sought a  tax exemption was used in "actual manufacturing, processing, or fabricating" of hydrocarbons within the meaning of Tax Code section 151.318(2), (5), or (10).  Thus, Southwest is not entitled to an exemption from paying sales taxes on purchases of the equipment.  Our conclusion makes it unnecessary to address any other issues the parties present.

We affirm the judgment of the court of appeals.

_____
Phil Johnson
Justice

**OPINION DELIVERED:**  June 17, 2016