# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00406-CV

---

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and
Ken Paxton, Attorney General of the State of Texas, Appellants**

**v.**

**Texas Westmoreland Coal Co., Appellee**

---

**FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-19-000374, THE HONORABLE DUSTIN M. HOWELL, JUDGE PRESIDING**

---

### O P I N I O N

This appeal concerns whether a taxpayer who extracts and processes coal for ultimate sale is entitled to the manufacturing exemption from Texas's sales and use taxes. *See* Tex. Tax Code § 151.318 ("Property Used in Manufacturing"). The trial court rendered judgment in favor of Texas Westmoreland Coal Co. (Westmoreland), determining that Westmoreland proved its entitlement to the exemption and was owed a tax refund. *See id.* § 151.318(a)(2)(A) (providing exemption for tangible personal property used in manufacturing, processing, or fabrication of tangible personal property for ultimate sale); *see also id.* § 112.151 (authorizing tax-refund suits). On appeal, Comptroller Glenn Hegar and Attorney General Ken Paxton (collectively, the Comptroller) contend that the exemption does not apply as a matter of law because the coal began its processing journey as real property. For the following reasons, we will affirm the trial court's judgment.

During the tax period at issue (July 1, 2012, through December 31, 2014), Westmoreland owned and operated a lignite coal mine in Texas. Westmoreland used different types of heavy equipment to produce the lignite coal that it ultimately sold to NRG Energy Corporation. The first step in Westmoreland's coal-production process was removing a layer of dirt called "overburden" sitting on top of the lignite coal formation with a piece of equipment called a "dragline" (which is not at issue here). The removal of the overburden exposed the lignite formation. Westmoreland then used three excavators—the equipment at issue here—"to crack, break apart, and reduce the size of the lignite coal." Westmoreland leased the excavators, purchased component parts for them, and paid sales and use taxes on the leases and parts.

The excavators have large buckets with teeth mounted on them. In "one seamless process," Westmoreland's equipment operators "dragged the [excavator] buckets' teeth through the exposed lignite coal formation to crack, break, or rip apart the lignite coal formation" and—"[o]nce the buckets . . . [we]re filled with pieces of lignite coal"—dumped the lignite into trucks from a height of about ten or twelve feet, further breaking it apart. Westmoreland could only sell the lignite to NRG in small pieces that ranged from the size of a pea to a soccer ball because NRG's equipment could not handle larger sizes, and lignite coal "is not naturally sized in pea to soccer ball sized pieces." Westmoreland "broke the lignite apart with the [excavators] in order to produce" the appropriately sized pieces and "ultimately produced lignite coal" in such-sized pieces (the Product) for sale to NRG.

Westmoreland filed a tax-refund claim with the Comptroller to recover over $2.4 million in sales and use taxes it claimed to have overpaid during the tax period at issue.

---

[1] The facts in this section are derived from the trial court's uncontested findings of fact.

The Comptroller granted the claim in part, agreeing to refund over $1 million. Westmoreland requested a hearing to challenge the denial of the remainder of its claim, asserting that it was entitled to a refund of a portion of tax it had paid on leasing the three excavators and purchasing parts for them because it was directly using tangible personal property (the excavators) in the processing of tangible personal property for ultimate sale (the Product).[2]  *See id.* § 151.318(a)(2)(A).

The "processing exemption"[3] on which Westmoreland relied provides,

> (a) The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer:
>
> . . .
>
> (2) *tangible personal property directly used* or consumed *in or during the actual* manufacturing, *processing*, or fabrication *of tangible personal property for ultimate sale* if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to:
>
>> (A) the product being manufactured, processed, or fabricated for ultimate sale[.]

*Id.* § 151.318 (emphases added).

The Comptroller determined that Westmoreland was not entitled to the processing exemption and denied the refund. After the Comptroller denied Westmoreland's motion for rehearing, Westmoreland filed this tax-refund suit. *See id.* § 112.151. After a bench trial, the trial

---

[2] Westmoreland sought a refund for only the percentage of time that the excavators were used to "break apart, rip, and reduce the size of the lignite coal."

[3] While the Section 151.318 exemption is commonly known as the "manufacturing exemption," Westmoreland claimed before the Comptroller and the trial court that it specifically engaged in the "processing" of the Product rather than the "manufacturing" or "fabrication" of it, and therefore we refer hereafter to the more specific portion of the exemption at issue as the "processing exemption."

court rendered judgment in favor of Westmoreland, awarding it a refund of $208,578.40 (about $50,000 less than the amount Westmoreland requested). Per the Comptroller's request, the trial court issued findings of fact and conclusions of law, including the following conclusion: "[The excavators] and their component parts were used in exempt processing by directly causing physical changes to lignite coal." *See id.* § 151.318(a)(2)(A). The Comptroller timely filed this appeal.

## DISCUSSION

In one issue, the Comptroller contends that the trial court erred in construing Tax Code Section 151.318(a)(2)(A) and applying it to the undisputed facts to conclude that Westmoreland is entitled to the processing exemption for its coal production. The Comptroller argues that Westmoreland is not entitled to the exemption because (1) the lignite coal constituted real property, not personal property, when the excavators first dug into the coal formation and (2) "processing" under the statute does not encompass extracting minerals from the earth. Therefore, the Comptroller concludes, Westmoreland as a matter of law did not use the excavators in the "actual processing" of "tangible personal property for ultimate sale." *See id*.

Our review of the Comptroller's issue turns on statutory construction, which is a question of law we review de novo. *See First Am. Title Ins. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008). Our primary objective is to give effect to the legislature's intent, which we ascertain from the plain meaning of the words used in the statute, if possible. *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). The legislature's intent must, if possible, be discovered within the language the legislature enacted. *Texas Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 135-36 (Tex. 2018). When text is clear and unambiguous, it is determinative of intent. *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74–75 (Tex.

4

2016). If statutory language is unambiguous, we will interpret and apply the statute according to its plain meaning unless a different meaning is apparent from the context or the plain meaning leads to absurd results. *In re Ford Motor Co.*, 442 S.W.3d 265, 280 (Tex. 2014).

In determining a statute's meaning, we construe the statute as a whole rather than construing specific provisions in isolation. *Id.* We look at the entire act in determining the legislature's intent with respect to specific provisions. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011). Undefined terms are afforded their ordinary meaning unless a different or more precise definition is apparent from the context of the statute, *see* Tex. Gov't Code § 311.011(a); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011), because we cannot give an undefined term a meaning that is disharmonious or inconsistent with other provisions in the statute, *see Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). Also, while tax exemptions are narrowly construed, and the taxpayer has the burden to "clearly show" that an exemption applies, *see* Tex. Tax Code § 151.318(r), construing exemptions narrowly "does not mean disregarding the words used by the Legislature," *Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016).

Here, the statute is clear and unambiguous, and there is no dispute, that for the processing exemption to apply (1) the ultimate product a taxpayer offers for sale must be tangible personal property (and not, e.g., real property or intangible personal property), (2) the item (e.g., equipment) directly used or consumed in the production of the ultimate product must be tangible personal property, and (3) the item (e.g., equipment) directly used or consumed in the production must directly make or cause a chemical or physical change to the product being produced for ultimate sale. *See* Tex. Tax Code § 151.318(a)(2)(A). Each of the foregoing requirements was met: (1) the Product that Westmoreland sold to NRG was tangible personal

5

property, (2) the excavators directly used to process the Product (and for which Westmoreland paid sales and use taxes) were tangible personal property, and (3) the excavators caused physical changes to the lignite coal during the production process.

Nonetheless, the Comptroller contends that there is a fourth requirement, and this is where the parties join issue: Does an *input* in the production process have to be tangible personal property itself? The Comptroller argues that the excavators were not processing *personal* property because the lignite formation constituted *real* property at the moment the excavators first dug into it. *See In re Estate of Ethridge*, 594 S.W.3d 611, 616 (Tex. App.—Eastland 2019, no pet.) ("[I]t is well settled that mineral interests are interests in real property, but minerals become personal property when severed or extracted from the land."); *see also Cage Bros. v. Whiteman*, 163 S.W.2d 638, 641 (Tex. 1942) ("Earth, sand, and gravel while remaining in its original bed is a part of the realty[.]"). Furthermore, the Comptroller argues, because the processing at issue constituted "one seamless process" from when the excavators first dug into the formation until when the lignite pieces landed in the dump trucks, Westmoreland is not entitled to the exemption for any portion of that process (i.e., for the period after the lignite had been severed from the realty until when it landed in the trucks). Therefore, the Comptroller's argument concludes, the excavators were used in the "processing" of real property, not personal property. Based on the plain language of the statute and recent precedent, we disagree.

First, we observe that the statute imposes no express requirement concerning the legal character of inputs or raw materials and, in fact, does not mention inputs or raw materials at all. Rather, the statute's plain language provides an exemption for the excavators to the extent that they were used in the "actual manufacturing, processing, or fabrication *of tangible personal property for ultimate sale*." *See* Tex. Tax Code § 151.318(a)(2) (emphasis added). The

6

Comptroller's reading does not comport with the statute's (1) grammatical structure and prepositional phrase—the "manufacturing, processing, or fabrication *of tangible personal property for ultimate sale*"; (2) repeated use of the phrase "for ultimate sale"; and (3) grouping together of manufacturing, processing, and fabrication. In this context and as explained below, the only reasonable reading of the preposition "of" in the phrase "manufacturing, processing, or fabrication *of* tangible personal property for ultimate sale" is that the preposition is used to indicate the end product of a production process, not the inputs or the process itself. *See Willacy Cnty. Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 555 S.W.3d 29, 39 (Tex. 2018) (noting "fundamental principle of statutory construction that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used"). Read as a whole, the statute contemplates certain conditions that must be met with respect to the production of an end product *for ultimate sale* to entitle the taxpayer to the exemption. It expressly applies to the manufacturing *of*, the processing *of*, or the fabrication *of* a particular product for ultimate sale, and the essence of those three related processes is that the output at the end of the process is different from the one or more inputs along the way. The exemption does not, however, either grammatically or conceptually contemplate that the inputs *themselves* are being manufactured, processed, or fabricated.

While the statute does not define the nouns "processing" or "fabrication," it does in subsection (d) specify that the noun "manufacturing" includes "each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties (including packaging, if any) that it has when transferred by the manufacturer to another." Tex. Tax Code § 151.318(d). As in subsection (a)(2)(A), in subsection (d) the prepositional phrase "of tangible property" again

7

appears—following the noun "production"—evincing a concern with an end product, not inputs. When construing statutory terms, we will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute. *In re Hall*, 286 S.W.3d 925, 929 (Tex. 2009). In this statutory context, the fact that the noun "processing" is listed with the noun "manufacturing"—an activity expressly having to do with the production of a final end product (a tangible good) for sale—indicates that the focus of the activity is on the end product, not the inputs. *See Aleman v. Texas Med. Bd.*, 573 S.W.3d 796, 815 (Tex. 2019) (explaining "noscitur a sociis" canon of construction as requiring that "when words 'are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar'").

Furthermore, it would be grammatically incongruent for the legislature to have grouped the phrase "processing of" with the phrases "manufacturing of" and "fabrication of"—both of which commonly refer to the production of a particular end product, e.g., the manufacture *of* cars or the fabrication *of* notebooks—if the phrase "processing of" did not also refer to the production of a particular end product. *See Willacy Cnty. Appraisal Dist.*, 555 S.W.3d at 38–39 (explaining series-qualifier canon of statutory construction as "when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series") (quoting *Sullivan v. Abraham*, 488 S.W.3d 294, 297 (Tex. 2016)); *see Of*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/of (last visited Oct. 5, 2021) (explaining, relevantly, that "of" is "used as a function word to indicate the object of an action denoted or implied by the preceding noun"); *see also id.* at https://www.merriam-webster.com/dictionary/fabricate (defining "fabricate" to mean "construct, manufacture" and "to construct from diverse and

8

usually standardized parts // [e.g.,] Their plan is to fabricate the house"); *id.* at https://www. merriam-webster.com/dictionary/manufacture (defining noun "manufacture" as "the process of making wares by hand or by machinery especially when carried on systematically with division of labor // [e.g.,] the *manufacture* of automobiles"); *id.* at https://www.merriam-webster.com/dictionary/process (defining verb "process," relevantly, to mean "to subject to a special process or treatment (as in the course of manufacture or film development). To read the statute as the Comptroller suggests would require the prepositional phrase "of tangible personal property for ultimate sale" to apply to the noun "processing" differently from how it applies to the nouns "manufacturing" and "fabrication." To do so would contravene basic grammatical and statutory-construction rules and be at odds with the more harmonious and contextual construction discussed above.

Secondly, this construction is supported by the supreme court's *Southwest Royalties* opinion construing the exemption's term "processing" in a case where the Comptroller argued, among other things, that the taxpayer was not engaged in processing because the equipment at issue did not *directly* cause changes to the product (hydrocarbons). *See* 500 S.W.3d at 406. In *Southwest Royalties*, the supreme court agreed with the Comptroller and upheld the lower courts' determinations that casings used to line oil and gas wells and tubing used to bring hydrocarbons from the wells to the surface did not directly change the hydrocarbons (i.e., cause them to separate into gases and liquids) because those changes occurred naturally as a result of pressure changes when the substances migrated into the wells and up to the surface. *See id.* The supreme court mentioned but (because of its holding) did not need to address the Comptroller's alternate argument (similar to that here) that the hydrocarbons were

9

real property while they remained underground and thus the taxpayer was not processing personal property but only real property. *See id.* at 404.

Even so, the Comptroller cites the opinion as supportive of his proposed construction of the term "processing" here, based on the supreme court's construction of that term: "the application of materials and labor necessary to modify or change characteristics *of tangible personal property*." *See id.* at 406 (emphasis added). However, the supreme court was not squarely addressing the dispositive issue presented here, and its focus was on whether the otherwise taxable items at issue (the casing and tubing) were directly causing the changes to the product being processed.[4] While the prepositional phrase "for ultimate sale" follows the phrase "of tangible personal property" in the exemption's text, the supreme court did not cite that important qualifying phrase, presumably because it was not relevant to the dispositive issue in that case.[5] *See id.* However, that prepositional phrase is relevant here, as discussed above, and thus the supreme court's construction of the term "processing" as requiring a direct physical or chemical change does not preclude our holding.

Furthermore, in *Southwest Royalties* the supreme court cited with approval three prior Comptroller decisions that support Westmoreland's position. *See id.* at 409. In those decisions involving facts analogous to those here, the Comptroller determined that the taxpayer was entitled to the processing exemption—a position that is directly at odds with his position

---

[4] It is undisputed that Westmoreland's excavators were directly causing physical changes to the lignite coal.

[5] The dispositive issue in *Southwest Royalties*—essentially, "Is processing happening when equipment does not directly cause physical or chemical changes to the product being produced?"—does not aid in determination of the dispositive issue here—essentially, "Need the main input in the production process begin its processing journey as personal property?"

here. *See id.* (citing Comptroller decisions allowing exemption where equipment was used to shatter limestone formations to be processed into cement, explosives were used to blast rock and sandstone formations to be processed into gravel and sand, and dynamite was used to blast rock out of earth to be processed into gravel). We interpret the supreme court's favorable citation to those Comptroller decisions as indicative of the high court's assessment of the real property versus personal property distinction and thus as support of our conclusion that exempt processing can include the severance of minerals or other physical materials from the earth when the exemption's express requirements are otherwise met, as they were here. *See id.* We accordingly overrule the Comptroller's issue.

## CONCLUSION

Having overruled the Comptroller's sole issue on appeal, we affirm the trial court's final judgment.

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   October 7, 2021

11