# Supreme Court of Texas

No. 22-0062

Gabriel Investment Group, Inc.,

*Appellant,*

v.

Texas Alcoholic Beverage Commission,

*Appellee*

On Certified Questions from the
United States Court of Appeals for the Fifth Circuit

**Argued March 24, 2022**

JUSTICE BLACKLOCK delivered the opinion of the Court.

Retail liquor stores in Texas operate under "package store permits" governed by Chapter 22 of the Alcoholic Beverage Code. In 1995, the Legislature prohibited public corporations from owning or holding an interest in package store permits. TEX. ALCO. BEV. CODE § 22.16(a). At the same time, the Legislature exempted from this prohibition any public corporation that, as of April 1995, already had permits or had permit applications pending. *Id.* § 22.16(f). The Fifth

Circuit certified the following questions about the scope of this exemption:

1. If Texas Alcoholic Beverage Code Section 22.16(f) exempts a package store from section 22.16(a), and if the package store sells any, most, or all of its shares to a corporation that does not itself qualify under section 22.16(f), will the package store's package store permits remain valid?

2. If yes to (1), can the package store validly accumulate additional package store permits by reason of section 22.16(f)?

24 F.4th 503, 508 (5th Cir. 2022).

As is customary, the Fifth Circuit "disclaim[ed] any intention or desire that the Court confine its reply to the precise form or scope of the question certified." *Id.* The parties agree we should construe the certified questions to ask about a public corporation's package store permits, not a "package store's package store permits." We understand the questions to ask whether section 22.16(f) continues to exempt a public corporation if that corporation sells some or all its shares to a non-exempt corporation, and, if so, whether the exempt corporation can acquire additional package store permits.

We answer both questions yes. Subsection 22.16(f) provides that section 22.16 "shall not apply" to an exempt public corporation. TEX. ALCO. BEV. CODE § 22.16(f). The only way to answer either certified question "no" would be to "apply" section 22.16 to limit the rights of an exempt public corporation. Of course, applying section 22.16 as contemplated in the certified questions would *also* apply section 22.16 to a non-exempt corporation, as the statute otherwise permits. But this does not change the fact that section 22.16 cannot be used to restrict an

2

exempt corporation's ownership of package store permits without "applying" the section to the exempt corporation. Simultaneous application of the statute to two corporations—one exempt and one non-exempt—inescapably includes applying the statute to the exempt corporation, in violation of section 22.16(f). Although this result may lead to consequences many have not heretofore anticipated, we consider it to be dictated by the statute's text, and the Legislature is of course free to respond to our decision as it sees fit.

## I.

The Alcoholic Beverage Code heavily regulates the ownership of package store permits. For instance, "a person may not hold or have an interest, directly or indirectly, in more than 250 package stores or in their business or permit."[1] *Id.* § 22.04(a). In a similar vein, the Alcoholic Beverage Commission (TABC) cannot issue more than 15 permits to one person in a calendar year, subject to exceptions. *See id.* §§ 22.04(c), 22.041. And no person "who holds a package store permit or owns an interest in a package store may have a direct or indirect interest" in:

> (1) a brewer's, retail dealer's on-premise, or general or branch distributor's license;
>
> (2) a wine and malt beverage retailer's, wine and malt beverage retailer's off-premise, or mixed beverage permit; or
>
> (3) the business of any of the permits or licenses listed in Subdivisions (1) and (2) of this subsection.

---

[1] "[A] person has an interest in any permit in which his spouse has an interest; and . . . as to a corporate permittee, the stockholders, managers, officers, agents, servants, and employees of the corporation have an interest in the permit, business, and package stores of the corporation." TEX. ALCO. BEV. CODE § 22.04(b).

*Id.* § 22.06.

In 1995, the Legislature added the following restriction regarding public corporations:

> A package store permit may not be owned or held by a public corporation, or by any entity which is directly or indirectly owned or controlled, in whole or in part, by a public corporation, or by any entity which would hold the package store permit for the benefit of a public corporation.

*Id.* § 22.16(a). The statute defines "public corporation" as: "(1) any corporation or other legal entity whose shares or other evidence of ownership are listed on a public stock exchange; or (2) any corporation or other legal entity in which more than 35 persons hold an ownership interest in the entity." *Id.* § 22.16(b).[2]

The prohibition on public-corporation involvement with package store permits never covered all public corporations. Instead, it contained two exemptions. First, "[t]his section shall not apply to a package store located in a hotel." *Id.* § 22.16(d). Second, the exemption at issue here provides:

> (f) This section shall not apply to a corporation:
>
> > (1) which was a public corporation as defined by this section on April 28, 1995; and
>
> > (2) which holds a package store permit on April 28, 1995, or which has an application pending for a package store permit on April 28, 1995; and
>
> > (3) which has provided to the commission on or before December 31, 1995, a sworn affidavit stating

---

[2] Throughout this opinion, we use the term "public corporation" in the same slightly unconventional way the Legislature used it in section 22.16.

that such corporation satisfies the requirements of
Subdivisions (1) and (2).

*Id.* § 22.16(f).

Gabriel Investment Group, Inc. (GIG) sells liquor at 45 stores in Texas under the trade names "Gabriel's" and "Don's & Ben's Liquor." *See* 24 F.4th at 504; 630 B.R. 216, 217 (W.D. Tex. 2021). GIG has been around since the 1940s but was not incorporated until April 13, 1995. 24 F.4th at 504. A little over a week after incorporating, and just before the statutory deadline in subsection (f), GIG applied for a package store permit. TABC issued the permit in August 1995. *Id.* In December 1995, GIG filed an affidavit with TABC attesting that it met the requirements of section 22.16(f). *Id.* The parties agree that GIG satisfied section 22.16(f)'s requirements and is thus covered by the subsection (f) exemption.

In September 2019, GIG filed for Chapter 11 bankruptcy. As part of its bankruptcy plan, GIG proposed to divide itself into two distinct entities: (1) a privately held corporation that would continue operating as a chain of 32 Texas liquor stores,[3] and (2) a public corporation that would continue, as GIG, to own and acquire package store permits under the subsection (f) exemption. 622 B.R. 213, 215–16 (Bankr. W.D. Tex. 2020); 630 B.R. at 218–19. Irrespective of the details of the proposed transaction, the parties agree we should assume that the public corporation known as GIG that may emerge from bankruptcy will

---

[3] The private corporation is irrelevant to our resolution of the certified questions.

5

remain the very same public corporation known as GIG that qualified for the subsection (f) exemption in 1995.[4]

GIG has proposed to sell all or part of its shares to another public corporation, apparently a major publicly traded company. 630 B.R. at 219. Again, the parties ask us to assume that, after any such sale, GIG will remain a public corporation with an ongoing corporate identity distinct from that of its shareholder(s). GIG's value, of course, depends in large part on its continuing ability to acquire and maintain package store permits. *See id.* GIG therefore asked TABC if a stock sale to a public corporation that was not exempt under subsection (f) would affect GIG's exemption. *See id.* TABC answered that GIG would no longer enjoy the protections of subsection (f) if it sold shares to a non-exempt public corporation. *See id.*

After receiving this answer, GIG sought a declaration against TABC from the federal bankruptcy court that:

> (1) GIG is and will remain exempt from the public-corporation ban set forth in section 22.16(a) regardless of whether any future direct or indirect owner(s) of all or any portion of the issued and outstanding stock of GIG is itself a public corporation; and (2) the rights and privileges associated with GIG's section 22.16(f) exemption from the public-corporation ban will continue unimpaired following any acquisition of all or any portion of GIG's issued and outstanding stock.

---

[4] The post-bankruptcy public corporation has been denominated "Legacy GIG," but because the parties agree we should treat it as identical to the GIG corporation that qualified for the subsection (f) exemption in 1995, we will refer to it simply as GIG.

6

622 B.R. at 216. GIG and TABC filed cross-motions for summary judgment on this question.

The bankruptcy court sided with TABC. *Id.* at 221. GIG appealed to the district court, which affirmed. 630 B.R. at 217. The court held that only corporations that satisfy subsection (f) can own or control a package store permit. *See id.* at 228. Thus, "the exemption does not extend to a public corporation that directly or indirectly owns or controls an entity that holds a [] permit or would benefit from the [] permit, even if the entity that holds the [] permit is exempt." *Id.* GIG appealed. The Fifth Circuit certified the questions quoted above. 24 F.4th at 508. We accepted the certified questions.

## II.

### A.

This statutory-interpretation dispute requires us to focus on section 22.16 of the Alcoholic Beverage Code, reproduced here in full:

> (a) A package store permit may not be owned or held by a public corporation, or by any entity which is directly or indirectly owned or controlled, in whole or in part, by a public corporation, or by any entity which would hold the package store permit for the benefit of a public corporation.
>
> (b) For purposes of this section, a public corporation means:
>
> > (1) any corporation or other legal entity whose shares or other evidence of ownership are listed on a public stock exchange; or
> >
> > (2) any corporation or other legal entity in which more than 35 persons hold an ownership interest in the entity.
>
> (c) Before the commission may renew a package store permit, an individual who is an owner or officer of the permittee must file with the commission a sworn affidavit

7

stating that the permittee fully complies with the requirements of this section.

(d) This section shall not apply to a package store located in a hotel.

(e) Any package store permittee who is injured in his business or property by another package store permittee or by any other person by reason of anything prohibited in this section may institute suit in any district court in the county where the violation is alleged to have occurred to require enforcement by injunctive procedures and to recover triple damages plus costs of suit including reasonable attorney's fees.

(f) This section shall not apply to a corporation:

> (1) which was a public corporation as defined by this section on April 28, 1995; and

> (2) which holds a package store permit on April 28, 1995, or which has an application pending for a package store permit on April 28, 1995; and

> (3) which has provided to the commission on or before December 31, 1995, a sworn affidavit stating that such corporation satisfies the requirements of Subdivisions (1) and (2).

The first certified question asks whether subsection (f)'s exemption remains operative if an exempt public corporation sells its shares to a non-exempt public corporation. The answer is yes.

Subsection (f)'s reference to "[t]his section," which "shall not apply" to an exempt corporation, can only mean the entirety of section 22.16. Section 22.16(f) therefore exempts a public corporation that meets its requirements, such as GIG, from *all* of section 22.16, including all three of subsection (a)'s prohibitions. The only way to restrict GIG's rights as suggested by TABC is to "apply" subsection (a)'s prohibitions to GIG, which subsection (f) prohibits. If we simply do what

8

subsection (f) instructs and refrain from "applying" subsection (a) to GIG, there is nothing else in the statute authorizing any restriction of GIG's rights. Only by applying subsection (a) to GIG—in violation of subsection (f)—can section 22.16 be used to deprive GIG of its permits if it sells shares to a public corporation.

Nothing in the statutory text limits the subsection (f) exemption, other than the requirements needed to obtain the exemption in the first place. *See id.* § 22.16(f). As written, the exemption protects the public corporations that qualified for it from any of the consequences of section 22.16. The two exempt corporations that qualified in 1995 surely had many shareholders or multiple owners at the time, and it would have been expected that these shares could change hands over the years. Yet the Legislature did not include any limitation on ownership of shares in exempt corporations. Instead, it declared only that section 22.16 "shall not apply" to these corporations. Still, TABC seeks to do just that. It would apply section 22.16 to GIG by using subsection (a) to invalidate GIG's permits if GIG sells shares to another public corporation.[5]

TABC nevertheless argues that a non-exempt public corporation's interest in an exempt corporation remains prohibited despite subsection (f)'s protections for exempt corporations. According to TABC, subsection (f) exempts public corporations that meet its requirements only from the restrictions *on public corporations* in subsection (a). It

---

[5] All of this assumes, as we are told to assume, that GIG will remain the same, distinct "corporation" after bankruptcy and after the sale of its shares to another entity.

9

does not, however, protect exempt public corporations from the consequences of being the "entity" controlled or held by a public corporation in subsection (a). Under this reading, a non-exempt corporation cannot have an interest in any permit-holding entity, including an exempt corporation. Stated another way, an exempt corporation in which a non-exempt corporation has an interest cannot hold a package store permit.

This last way of stating TABC's position demonstrates why we must disagree with it. Yes, subsection (a) does prohibit public corporations from holding package store permits or having an interest in entities that do. But subsection (f) unqualifiedly exempts corporations like GIG from subsection (a), which "shall not apply" to them. TABC, however, reads the statute to mean that ownership of an exempt corporation by a non-exempt corporation prohibits the *exempt corporation* from having a permit. In this way, TABC would "apply" subsection (a) not just to the non-exempt corporation, but also to the *exempt* one. Indeed, subsection (a) operates directly on the permit-holding "entity," which loses its permits if it becomes owned by a public corporation or holds the permit for the benefit of a public corporation. Treating GIG as the "entity" in subsection (a) and then taking its permits away because of who owns its shares ineluctably "applies" subsection (a) to GIG, in direct violation of subsection (f).

In abstract terms, subsection (a) states the rule, while subsection (f) states an exception to the rule. No exceptions to the exception are stated. Naturally, then, we must look to the exception to determine the true scope of the rule. We would not normally look to the

10

rule to determine the true scope of the exception. Indeed, the exception changes the rule altogether. This is why we call such exceptions "carve outs." The exception changes the rule by "carving" a piece out of it. The carved-out piece of the rule is no longer part of the rule. There is a new, post-exception rule. And we need not worry much that the post-exception rule causes results that are inconsistent with the original rule. Of course it does. That is what exceptions do.

This is no less true just because applying subsection (a) to GIG, as TABC would do, also involves applying subsection (a) to a non-exempt corporation, which would otherwise be allowed. When subsection (a) is applied to both GIG and a non-exempt public corporation simultaneously, the exception and the rule cannot both be followed. In such an instance, we apply the exception as a limitation on the rule. That is the exception's function in the statute. We do not apply the rule as a limitation on the exception. When the exception and the rule conflict, the exception takes priority.

Thus, it is no objection to say that applying subsection (f) as GIG proposes causes subsection (a) to no longer achieve what it seems, in isolation, designed to achieve. Of course the exception limits the efficacy of the rule. Again, that is what exceptions do. We should not artificially limit the exception in an effort to achieve the original rule's purposes. The exception here is straightforward. Section 22.16 "shall not apply" to exempt corporations like GIG. If we simply apply that exception as it is stated, as an unqualified limitation on the application of subsection (a) to GIG—rather than look for reasons not to do so because of the consequences—it becomes clear that GIG cannot be treated as

either the "entity" or the "public corporation" in subsection (a). Putting either label on GIG "applies" subsection (a) to GIG, which we cannot do. True, the exception interferes with how the rule would otherwise apply to public corporations that own a stake in GIG, but that is because of how the exception is written. We do not limit the exception to serve the rule.

TABC contends that reading subsection (f) to allow exempt corporations owned by non-exempt corporations to hold permits would change subsection (f) to read "[t]his section shall not apply to *a permit held by* a corporation." TABC points to subsection (d)'s exemption for package stores in hotels. It argues that, because each package store must have a permit, the exemption of specific package stores in subsection (d) demonstrates that the Legislature knew how to exempt a package store's *permits*, which it did not do in subsection (f). In effect, TABC argues that subsection (a) can be applied to GIG's *permits* without applying it to GIG.

We are unconvinced. Whether or not the various elements of the statute are thought of as operating directly on permits, permit-holders, or public corporations, it remains true that applying subsection (a) as TABC proposes would apply subsection (a) to GIG. The crux of the dispute, perhaps, is what it means for a statute to "apply" to someone. We see no way to avoid the straightforward sense in which using a statute to take away a person's legal rights is "applying" the statute to that person. Section 22.16 cannot be applied to rescind a package store permit without also "applying" the statute to the entity holding the permit. The permit is a legal "privilege" held by the corporation. *See id.*

12

§ 11.03. Restricting or taking it away under the authority of section 22.16 would concretely affect the rights of the exempt corporation in a way that surely amounts to "applying" section 22.16 to the corporation, which in GIG's case violates subsection (f).

TABC asks the Court to construe any ambiguity in its favor in order to give effect to the Legislature's instruction that the Alcoholic Beverage Code be liberally construed in favor of temperance and to prevent "subterfuge ownership" of permits. *Id.* § 109.53. We decline to do so for a few reasons.

First, the statute is not ambiguous. The parties dispute the scope of subsection (f). But when it comes to ambiguity, the inquiry is not whether the statutory language creates unexpected results, "but rather whether the statutory language itself is ambiguous." *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 406 (Tex. 2016) (citation omitted). As discussed above, the statutory text "has a plain and unambiguous meaning about the particular dispute in the case" that is "coherent and consistent," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quotation omitted), and not subject to "multiple understandings." *Sw. Royalties*, 500 S.W.3d at 406. The statute is thus not ambiguous.

Second, section 109.53's stated purpose—avoiding subterfuge ownership—does not affect the issue in dispute. Because section 109.53 is part of the text enacted into law, we do not disregard it as we would a statement of purpose plucked from legislative history. Instead, such a textual indication of purpose can help to "determin[e] which of various

permissible meanings the dispositive text bears."[6]  But in this instance, the textual indication of purpose has no obvious consequence.

Subterfuge means "an artifice employed to escape censure or the force of an argument, or to justify opinions or conduct; an evasion." *Subterfuge*, WEBSTER'S INTERNATIONAL DICTIONARY (2d ed. 1953). Concerns about subterfuge *ownership* would come into play when it is unclear who actually owns or controls a permit.  In a case like this one, such an inquiry might look to whether GIG's apparent ownership of a permit is merely a subterfuge shielding the true identity of shadowy figures pulling the strings.  Here, however, there is no uncertainty as to ownership or control of the permit.  GIG clearly owns permits.  It wants another, non-exempt, public corporation to own its shares.  We are given no indication that this arrangement would somehow shield the identity of the non-exempt, public corporation or give rise to any other kind of "subterfuge."  If GIG owns the permits and another public corporation controls the permits by virtue of its controlling stake in GIG, there is no subterfuge.   All involved, including TABC, will be aware of the arrangement and will know who to hold responsible.[7]

---

[6] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 218 (2012); *accord, e.g., Sw. Royalties*, 500 S.W.3d at 405 ("If an undefined term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme.").

[7] The identity of a publicly traded company's major shareholders is freely available information posted on the SEC's website.  *See* https://www.sec.gov/edgar/searchedgar/companysearch.html.   Relative to publicly traded companies, private companies can more easily structure themselves to shield the identity of their owners.  It is therefore difficult to see how section 22.16's prohibition on publicly traded corporations holding

Section 109.53's instruction to construe the statute against "subterfuge ownership" tells us nothing about who may own a permit, so long as there is no concealment or evasion in the ownership. The task of defining who may own a permit belongs to section 22.16. Because there is no "subterfuge ownership" proposed here, and because section 22.16 is perfectly clear on its own, section 109.53's purpose provision makes no difference to this case.

Third, TABC's purposive reading would push section 22.16's otherwise clear text beyond its reasonable limits. Under TABC's reading, an exempt publicly traded corporation would lose its exempt status as soon as one of its shares was traded—by *anyone*—to a *non*-exempt public corporation. This loss in status would occur even though such a corporation does not control who owns its stock. Section 22.16(b) expressly defines "public corporation" to include those with shares "listed on a public stock exchange." If we accept TABC's reading, such a publicly traded corporation's exemption would vanish if even a single share of its stock were acquired by an entity that is itself owned even in part by a non-exempt public corporation. The exempt corporation could not control—and might not even know—whether its exemption survived. And any non-exempt corporation could torpedo the

_____

package store permits advances the statutory goal of eliminating "subterfuge ownership" at all, since there is little way for a public company to hide its ownership. It is perhaps easier to see how excluding publicly traded corporations advances the goals of avoiding *diffuse* ownership and reducing the potential for market dominance by very large firms. Neither of these goals is stated in section 109.53, however.

15

exempt corporation's permits merely by acquiring one of its shares. We find such an understanding of section 22.16 highly implausible.[8]

Finally, even under TABC's view of the statute, subsection (f)'s exemption for public corporations like GIG is already in tension with TABC's concerns about "subterfuge ownership." The two exempt corporations, using the advantages available to public companies, could have acquired hundreds of liquor stores and come to dominate the Texas market much like TABC fears they now will. The exempt corporations could have grown to be veritable Walmarts, in theory. They did not do so, but this was not because TABC could have stopped it using section 22.16. Thus, even as TABC construes it, subsection (f) opened the door to the kind of public-corporation-dominated scenario TABC claims we must avoid. The Legislature's decision to leave the door open to the unpredictable futures of the exempt public corporations was just as much a part of the statute's "purpose" as any other provision of the Code.

If GIG's unusual corporate structure relative to other permit holders had enabled it to grow to dominate the landscape, the Legislature could have responded to address concerns about the exempt corporations' diffuse ownership or their market dominance. The opposite seems to have happened, however, and GIG is now in bankruptcy. This history does not demonstrate that public corporations have an inherently unfair edge in the liquor retail business. Of course,

---

[8] We recognize, of course, that GIG is not a publicly traded company, but section 22.16 would operate the same way if GIG *were* so traded. The statute does not contemplate a different outcome for different kinds of public corporations; it prescribes a single rule for *all* public corporations.

16

some public corporations are better managed than others. Whether the law should further shield the Texas market from well-managed public corporations is a question for the Legislature.

TABC's concerns about public-corporation involvement in the liquor-store business are not concerns about what will happen if Texas allows public corporations to run liquor stores. We already do, and one of them is in bankruptcy. The agency's real concern seems to be that, if well-managed, a public corporation could change the face of the liquor retail business in Texas. That may be true, but it was just as true in 1995 when the Legislature exempted two public corporations from section 22.16's restrictions. Whatever the motivations may be for allowing two unthreatening public corporations to operate while excluding more successful public corporations, such an arrangement does not reflect a principled objection to "subterfuge ownership." In any event, the Legislature can act in response to any acquisition of GIG's stock by another public corporation, if it chooses to do so.

We answer the first certified question yes.[9]

## B.

As for the second certified question, TABC offers no argument that we can answer the second question "no" if the answer to the first

---

[9] Again, our analysis assumes GIG will remain the same, distinct public corporation that qualified for the exemption in 1995. We do not comment on any other scenario or on other potential changes to GIG that could interfere with its ongoing legal authority to hold package store permits. *See Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 128 (Tex. 2019) (observing that the Court typically "provide[s] answers solely as to the status of Texas law on the questions asked") (quoting *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 620 (Tex. 2004)).

question is "yes."  Because the parties agree that our answer to the first question dictates our answer to the second, we need not address the second question any further.  We answer the second certified question yes.

James D. Blacklock
Justice

**OPINION DELIVERED:** June 17, 2022