# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00335-CV

### Sidetracked Bar, LLC, Appellant

v.

### Glen Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas, Appellees

---

### FROM THE 201ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-003755, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

### O P I N I O N

This appeal arises from a tax-refund suit that Sidetracked Bar, LLC filed against the Comptroller and Attorney General after paying state sales taxes under protest.[1] *See* Tex. Tax Code §§ 112.052 (authorizing taxpayer-refund suits), .053 (designating required parties to suit). Sidetracked argues that the trial court improperly denied its motion for summary judgment and improperly granted the Comptroller's motion for summary judgment, determining that Sidetracked is not entitled to a refund because its provision of a sweepstakes constituted the sale of taxable amusement services and that Sidetracked did not prove its entitlement to an applicable exemption. For the following reasons, we affirm the trial court's summary judgment.

### APPLICABLE STATUTES AND PROCEDURAL BACKGROUND

The Texas sales tax is imposed on the sale of amusement services, among other items, in this state. *Id.* §§ 151.051(a) ("A tax is imposed on each sale of a taxable item

---

[1] We refer to appellees collectively as "the Comptroller."

in this state."), .010 ("'Taxable item' means tangible personal property and taxable services."), .0101(a)(1) ("'Taxable services' means . . . amusement services[.]").  Amusement services include "the provision of amusement, entertainment, or recreation."  *Id.* § 151.0028(a); *see also* 34 Tex. Admin. Code § 3.298(a)(1) (Comptroller of Pub. Accts., Amusement Servs.) (defining "amusement services" as "[e]ntertainment, recreation, sport, pastime, diversion, or enjoyment that is a pleasurable occupation of the senses").  For purposes of the sales tax, a "sale" is defined broadly as "the performance of a taxable service" "when done or performed for consideration." *See* Tex. Tax Code § 151.005(3).  Specifically for amusement services, a sale is defined as one of four occurrences "when done or performed for consideration."  *See id.*

The Comptroller audited Sidetracked for Texas sales taxes for two periods: July 2011 through December 2014 and January 2015 through December 2017.  After the Comptroller assessed sales taxes, penalties, and interest against Sidetracked for each period, Sidetracked paid the two amounts under protest and filed a tax-refund lawsuit with respect to each.  Sidetracked alleged that it paid under protest $284,083 for the first period and $98,694 for the second period, and the trial court consolidated the two causes per the parties' agreed motion.  The parties filed competing motions for summary judgment, after which the trial court granted the Comptroller's motion, denied Sidetracked's, and rendered a take-nothing final judgment.  This appeal followed.

## EVIDENCE

The Comptroller moved for a take-nothing summary judgment against Sidetracked, arguing that Sidetracked was in the business of selling taxable amusement services to its sweepstakes patrons during the periods at issue and did not meet the requirements for any applicable exemption.  He attached to his motion the following evidence: Sidetracked's responses and objections to the Comptroller's requests for admission and interrogatories;

2

excerpts from the depositions of Mark Olmstead, who is Sidetracked's sole owner, and Tina Lumpkins, the commander for AmVets Post 95 (Post 95), a charity benefitting from the sweepstakes; and Sidetracked's federal-income tax returns and Texas franchise-tax reports for the tax periods at issue.

Sidetracked also moved for summary judgment, seeking an order that the Comptroller must refund the amounts it paid under protest. It argued that it did not provide or sell any amusement services or, alternatively, that it is entitled to an exemption either because a charity provided the amusement services or because Sidetracked provided the services through coin-operated machines operated by its patrons. Sidetracked attached to its motion excerpts from Lumpkins's deposition and Olmstead's affidavit with attached exhibits. The exhibits consisted of photos of signs posted around the sweepstakes location and of the machines used in the sweepstakes operation, a copy of the sweepstakes rules, copies of receipts provided to sweepstakes patrons entitled "Donation Receipt" and indicating a "Donation Amount," copies of checks that Post 95 wrote to Sidetracked, and deposit slips for cash deposits that Sidetracked made to Post 95's bank account.

The following undisputed facts derive from the evidence submitted by both parties, the majority from Olmstead's deposition:

- Sidetracked was a for-profit, limited liability company during the periods at issue, and Post 95 is a non-profit organization supporting veterans.

- On its federal tax returns for the periods at issue, Sidetracked reported that its "principal business activity" was "gambling industries" and that its business activity was "sweepstakes." Some years it indicated its "product or service" was "gambling" and other years that it was "gaming." It similarly stated its "principal business activity" as "gaming" on its state franchise-tax returns.

- In 2012, Sidetracked (through Olmstead) approached Post 95's commander, Lumpkins, and proposed an arrangement whereby Sidetracked would run a sweepstakes, from which

3

Post 95 would receive 10% of the gross proceeds. The arrangement was memorialized in a Letter of Intent dated March 3, 2012, signed by Olmstead and Lumpkins. The Letter of Intent states that Post 95 "agrees to allow" Sidetracked "to represent to the City of Sampson Park that they will be the Charity for a sweepstakes fundraising location," that "all Net Donation to charity will be deposited in Charity bank account," that "Charity will receive 10% [of] all deposits," and that "Charity will not be responsible for any expenses incurred by" Sidetracked, including "any expenses associated with getting approvals from the City or any expenses associated with sweepstakes fundraising location." It also stated that "this is not a binding agreement and neither party is committing to any financial obligation."

- To run the sweepstakes, Sidetracked leased the facilities in its name, owned or leased the equipment used for the sweepstakes, and employed the necessary personnel. Post 95 did not own or lease the facilities or equipment.

- Upon entrance into Sidetracked's facilities, patrons automatically received from Sidetracked attendants a magnetic card loaded with 100 free entries to participate in the sweepstakes. An entry within Sidetracked's internal system constituted a "ticket" that afforded the holder a chance to win a cash prize.

- Patrons could load additional entries to their card to continue to participate in the sweepstakes in exchange for payments of "donations" to either a Sidetracked attendant or by using one of Sidetracked's "donation station" machines.

- To continue participating in the sweepstakes that same day, patrons had to make "donations" to receive additional entries that would be loaded onto their card. Otherwise, the patrons would have to come back another day.

- Sidetracked employees took patrons' "donations" (usually cash) at the "POS" [point of sale]—essentially a cash register. Each "donation" was $0.01 per entry (thus, customers could receive 2,000 entries for $20.00).

- Patrons were given free coffee, sodas, and snacks to entice them to give "donations."

- Upon receipt of the magnetic card, patrons could choose to reveal their entries (i.e., win or lose) in one of two ways: (1) instantly reveal them through "instant validation terminals," or (2) use an "entertainment validation terminal" that displayed a slot-machine gaming simulation and hit the "play entry" button after choosing the number of entries (one or a few) they would like to play each time.

- Validation terminals consisted of monitors with computers, keyboards, mouses, and card readers. Patrons would "spin the wheel" on the game-simulation machines by "clicking the mouse."

4

- Information regarding how many sweepstakes entries each entrant had, and the validated prizes, if any, associated with those entries was stored on the internal network (intranet) at the sweepstakes premises.

- To use a validation terminal, a sweepstakes entrant would "swipe" their magnetic card in the card reader located at the validation terminal, which would then display information "from the intranet regarding whether the sweepstakes card contains any winning entries, and, if so, the validated prizes associated with those entries."

- The only function the validation terminals could perform was to validate sweepstakes entries, and they were not connected to the Internet.

- The software running on the validation terminals was developed and maintained by the software vendors Blended Solutions and Front Edge Marketing, with whom Sidetracked contracted and negotiated the prices for their services.

- A patron with winning entries was eligible to receive cash prizes and sometimes participate in a drawing where Sidetracked would give away items such as a television.

- Patrons would redeem their winning entries with a Sidetracked attendant, who would pay the winnings in cash.

- At the end of each business day, Sidetracked employees would deposit the day's proceeds into Post 95's bank account.

- Lumpkins, on behalf of Post 95, would monitor the charity's bank account to report any discrepancies between it and the weekly invoices that Sidetracked prepared and provided her. Through the weekly invoices, Sidetracked directed Post 95 to pay the software vendors their approximately 40% share of the sweepstakes proceeds.

- Sidetracked made all of its money from the sweepstakes, ultimately keeping about 50% of the proceeds after Post 95 retained its 10%, paid the software vendors, and returned the remaining proceeds to Sidetracked.

- Sidetracked posted all the signs throughout its facilities and the rules and regulations concerning the sweepstakes (which were drafted by Sidetracked's attorneys). Representative signs read, "AmVets thanks you for your donation" and "Charity Sweepstakes."

- Post 95 did not take any action to promote the sweepstakes, and none of its members needed to be present for the sweepstakes or had access to Sidetracked's facilities outside of the sweepstakes operating hours. During the periods at issue, Lumpkins visited the sweepstakes premises three to four times.

5

- Sidetracked did not obtain the necessary licenses or display the requisite decals for the terminals as "coin-operated machines" and did not pay any occupation tax on the "coin-operated machines" serving as its validation terminals.

- Sidetracked's relationship with Post 95, the equipment used in the sweepstakes, and Sidetracked's operation of the sweepstakes remained the same throughout the periods at issue.

- As Olmstead admitted, Sidetracked's aim, through the sweepstakes, was to provide entertainment value for patrons, and patrons were drawn to its facilities to participate in the sweepstakes because of the entertainment value being offered. Specifically as to the slot-machine simulation displayed on the validation terminals, the aim was to entertain the patrons.

- The sweepstakes rules and regulations recite the following: "In-store promotional entries without a purchase are limited to one request per person per day," "All Entries can be validated instantly or validated through a game for entertainment," and "Sponsor's liability will be limited to the cost of entering and participating in the Sweepstakes."

## DISCUSSION

### *Standard of review and statutory construction*

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *see also* Tex. R. Civ. P. 166a(c) (outlining requirements for entitlement to summary judgment). When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary-judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). A motion for summary judgment must stand or fall on the grounds expressly presented in the motion, and a trial court considering such a motion is restricted to the issues presented in the motion, response, and replies. *See* Tex. R. Civ. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341–42 (Tex. 1993).

6

When adjudicating a party's entitlement to summary judgment requires statutory construction, as here, we seek to ascertain and effectuate the legislature's intent in enacting the statute. *See Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016); *Upjohn Co. v. Rylander*, 38 S.W.3d 600, 607 (Tex. App.—Austin 2000, pet. denied). "We start with the text because it is the best indication of the Legislature's intent." *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 435 (Tex. 2011). We examine the language used in the statute, in the context of the entire act, and we read every word, phrase, and expression presuming that the legislature chose each word for a purpose and purposefully omitted words not chosen. *See City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 55 (Tex. 2015); *Upjohn*, 38 S.W.3d at 607. When a statute is unambiguous, we do not turn to extrinsic aids or canons of construction to construe it—we simply follow the unambiguous language. *See City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 261 (Tex. 2018); *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013); *Ojo*, 356 S.W.3d at 435–36.

In determining a statute's meaning, we consider the statute as a whole rather than construing specific provisions in isolation. *In re Ford Motor Co.*, 442 S.W.3d 265, 280 (Tex. 2014). Undefined terms are afforded their ordinary meaning unless a different or more precise definition is apparent from the context of the statute, *see* Tex. Gov't Code § 311.011(a); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011), because we cannot give an undefined term a meaning that is disharmonious or inconsistent with other provisions in the statute, *see Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). If an undefined term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme. *Southwest Royalties*, 500 S.W.3d at 405.

7

*Sidetracked's issues*

Sidetracked presents two appellate issues to support its contention that the trial court erred in denying its summary-judgment motion and granting the Comptroller's. First, it argues that it did not make any "sales" of amusement services because it either (1) did not provide any amusement services at all or (2) did not engage in a statutorily enumerated activity constituting the sale of amusement services. *See* Tex. Tax Code § 151.005(3). Secondly, it argues that—even if it did make sales of amusement services—it proved its entitlement to two exemptions: one for amusement services provided exclusively by a non-profit organization, *see id.* § 151.3101(a)(3), and another since-repealed exemption for amusement provided by coin-operated machines operated by the consumer, *see* Act of July 3, 1984, 68th Leg., 2d C.S., ch. 31, art. 7, § 15, 1984 Tex. Gen. Laws 193, 225 (repealed 2019) (Former Section 151.335(a)); *see also* Tex. Tax Code § 151.301 ("If a taxable item is exempted from the taxes imposed by this chapter, [its] sale . . . is not subject to the sales tax . . . if the item meets the qualifications for exemption as provided in this subchapter.").[2] The Comptroller responds by reasserting the arguments made in its summary-judgment motion: the "donations" Sidetracked received were in fact "sales of admissions" affording patrons additional entries into the sweepstakes and use of the validation machines, *see* Tex. Tax Code § 151.005(3), and Sidetracked did not prove its entitlement to either claimed exemption.

*Whether Sidetracked provided amusement services*

---

[2] While not applicable to this dispute, in the act repealing the exemption, the legislature also amended Section 151.0028, which defines "amusement services," to add Subsection (c), expressly excluding "services provided through coin-operated machines that are operated by the consumer" from the definition of "amusement services." *See* Act of May 21, 2019, 86th Leg., R.S., ch. 638, §§ 1, 5, 2019 Tex. Gen. Laws 1875, 1875, 1876; *compare* Tex. Tax Code § 151.0028 (current statute), *with* Act of July 3, 1984, 68th Leg., 2d C.S., ch. 31, art. 7, § 3, 1984 Tex. Gen. Laws 193, 222 (amended 2019).

Because sales taxes are imposed, relevantly here, only on the "sale" of amusement services, *see id.* §§ 151.010, .0101(a)(1), .051(a), we first consider the threshold question of whether Sidetracked provided any "amusement services" during the periods at issue, *see id.* § 151.0028(a) (defining amusement services). The Comptroller argues that Sidetracked provided the following "amusement services": use of the slot-machine-style validation terminals, through which patrons "continued their enjoyment" of the sweepstakes by revealing whether their additional entries were winners. Sidetracked counters that it did not provide "amusement services" to patrons but only "entertaining enticements" to Post 95's potential donors and "advertising and promotion services" to Post 95—the true "provider" of the sweepstakes and thus amusement.

Olmstead admitted that the aim of the sweepstakes was to provide entertainment for patrons, who were drawn to Sidetracked's facilities to participate in the sweepstakes because of its entertainment value, and that the slot-machine simulations on the validation terminals were intended to entertain patrons. Also, the sweepstakes rules specifically noted that patrons could validate their entries "through a game for entertainment." The Tax Code defines "amusement services" as "the provision of amusement, entertainment, or recreation." *Id.*; *see also* 34 Tex. Admin. Code § 3.298(a)(1) (defining "amusement services" as "[e]ntertainment, recreation, sport, pastime, diversion, or enjoyment that is a pleasurable occupation of the senses"). Furthermore, the Tax Code specifies that the Comptroller "shall have exclusive jurisdiction to interpret" the term "taxable services," and, further, that the term "amusement services" expressly falls under the term "taxable services." *See* Tex. Tax Code § 151.0101(b). We conclude on the basis of the undisputed evidence that patrons' swiping of their magnetic cards (loaded with entries) at the validation terminals and playing of the slot-machine games to

9

discover whether any of their entries were winners constituted amusement. *See Roark Amusement & Vending*, 422 S.W.3d at 636–38 (determining that plush-toy crane machines' offer of "intrigue" and "the possibility of winning" constituted amusing activity).

Furthermore, the undisputed evidence establishes that Sidetracked, not Post 95, was the provider of that amusement: (a) it indicated on its tax returns that its business or products as "sweepstakes," "gambling," and "gaming"; (b) it leased or owned the premises and the machines used in the sweepstakes operation; (c) it employed the necessary personnel to run the sweepstakes operation; (d) it contracted with the software companies who managed and maintained the validation terminals; (e) it posted the signage at the sweepstakes premises, and its attorneys drafted the sweepstakes rules; and (f) Post 95 members did not need to be on the premises while the sweepstakes was operating, and in fact could not be on site when it was not. Thus, the evidence established, as a matter of law, that Sidetracked provided "amusement services" under Section 151.0028(a). However, that is not the end of the inquiry; we next consider the parties' arguments about whether Sidetracked made "sales" of amusement services, *see* Tex. Tax Code § 151.005(3), and thus whether either party was entitled to summary judgment on that basis.

### Whether Sidetracked made taxable sales

In its summary-judgment motion, the Comptroller argued that Sidetracked made taxable "sales" because it "collected admission fees" as consideration for its provision of amusement services—the second of the four statutorily specified activities constituting sales of amusement services. *See id.*. We thus consider whether the evidence established, as a matter of law, that Sidetracked "collected admission fees" as consideration for its provision of amusement

10

services. Resolution of this issue requires us to construe the phrase "collection of an admission fee" in Section 151.005(3).

That statute outlines four specific activities constituting "sales" of admission services:

> "Sale" or "purchase" means any of the following when done or performed for consideration:
>
> . . .
>
> (3) the performance of a taxable service, the charge for an extended warranty or service contract for the performance of a taxable service, or, **in the case of an amusement service**, [1] a transfer of title to or possession of a ticket or other admission document, [2] **the collection of an admission fee, whether by individual performance, subscription series, or membership privilege**, [3] the collection of dues or a fee, charge, assessment, including an initiation fee, by a club or organization for membership or a special privilege, status, or membership classification in the club or organization, or [4] the use of a coin-operated machine[.]

*Id.* § 151.005 (emphases added).

The Tax Code does not define the term "admission fee," and we therefore give the term its plain and common meaning, as is appropriate within the context of the statute and consistent with the statute's other provisions. *See* Tex. Gov't Code § 311.011(a); *TGS-NOPEC Geophysical Co.*, 340 S.W.3d at 439; *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003); *Needham*, 82 S.W.3d at 318. The dictionary defines "admission" as, relevantly, "the right or permission to enter a place, a group, etc.," using the example of "countries denied admission to NATO." *See* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/admission (last visited Dec. 27, 2022). The transitive verb "enter" means, relevantly, "to come or go into [as in a room]" or "to become a member of or an active participant in [as in a university or a race]." *See id.*, https://www.merriam-webster.com/dictionary/enter (last visited

11

Dec. 27, 2022).  And a fee is "a sum paid or charged for a service" or "a fixed charge."  *See id.*, https://www.merriam-webster.com/dictionary/fee (last visited Dec. 27, 2022).  Employing these definitions, we thus construe the term "admission fee" in the context of the statute, which contemplates the payment of an "admission fee" in exchange for another's provision of amusement services.  *See* Tex. Tax Code § 151.005.  Therefore, we consider whether the evidence established that the "donations" Sidetracked collected from patrons constituted fees they paid for the right to (1) enter a place where Sidetracked provided amusement services, (2) become a member of a group allowed to access Sidetracked's amusement services, or (3) become an active participant in the amusement services that Sidetracked provided.

The undisputed evidence conclusively establishes that after their initial free entries were redeemed, patrons could no longer engage in the amusing activity of playing the slot-machine-type games and discovering whether their sweepstakes entries were winners without paying for additional entries.  By making so-called "donations," the patrons were entitled to further active participation in the amusing activity of the sweepstakes—by swiping their cards, choosing how many entries to "play" at a time, "spinning" the wheel with the computer mouse, and discovering whether their entries were winners.  Although Sidetracked characterizes the payments for additional entries as "donations," and even though the signage and "receipts" given to patrons cast the payments as "donations," we must consider the objective reality of the transactions at issue rather than the labels placed upon them by Sidetracked.  *See Roark Amusement & Vending*, 422 S.W.3d at 637 & n.14; *see also Boulware v. United States*, 552 U.S. 421, 429 (2008) ("The colorful behavior described in the allegations requires a reminder that tax classifications . . . turn on 'the objective realities of a transaction rather than the particular form the parties employed.'").

The objective reality of Sidetracked's operations during the periods at issue is that it charged patrons consideration in exchange for additional entries into the sweepstakes, providing them a chance to win a cash prize, and further access to the validation terminals, which meets the definition of "amusement." *See Roark Amusement & Vending*, 422 S.W.3d at 637. Sidetracked's employees took patrons' payments in exchange for loading their cards with additional entries, or patrons loaded their cards with extra sweepstakes entries themselves at so-called "donation stations." While a percentage of Sidetracked's proceeds were ultimately donated to Post 95—after Sidetracked deposited all its gross proceeds into Post 95's account and then 10% was retained by Post 95—such donations do not alter the reality that it performed the amusement services for consideration in the form of patrons' payments for sweepstakes entries. We accordingly conclude that Sidetracked's charging of patrons for additional sweepstakes entries constituted its collection of "admission fees," *see* Tex. Tax Code § 151.005(3), and Sidetracked thus made sales of amusement services during the tax periods at issue, *see id.* § 151.0028(a). We overrule Sidetracked's first issue.

### Whether Sidetracked proved its entitlement to an exemption

In its summary-judgment motion, Sidetracked argued that it was entitled to two exemptions from the sales tax. The first exemption provides, "Amusement services are exempted from . . . [sales] taxes . . . only if exclusively provided . . . by a nonprofit corporation or association." *See id.* § 151.3101(a)(3). The second exemption, effective during the periods at issue but repealed in 2019, provides, "Amusement and personal services provided through coin-operated machines that are operated by the consumer are exempt from the taxes imposed by this chapter." *See* Act of July 3, 1984, 68th Leg., 2d C.S., ch. 31, art. 7, § 15, 1984 Tex. Gen. Laws 193, 225 (repealed 2019) (Former Tex. Tax Code § 151.335(a)).

13

Because a taxpayer has the burden to "clearly show" that an exemption applies, *see Southwest Royalties*, 500 S.W.3d at 404, Sidetracked was entitled to summary judgment only if it conclusively established each element of either exemption. *Cf. KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015) (noting that party who conclusively establishes all elements of affirmative defense is entitled to summary judgment). On the basis of the undisputed evidence, and remembering that tax exemptions are narrowly construed, *see Southwest Royalties*, 500 S.W.3d at 404, we conclude that the evidence conclusively established that Sidetracked is not entitled to either exemption and that the Comptroller was entitled to summary judgment as a matter of law.

Sidetracked bases its argument about the first exemption on the theory that it was Post 95 that provided the amusement services, not itself. However, as explained above, the evidence conclusively established that Sidetracked provided the amusement services—the equipment, the premises, the employees, the software vendors, the signage, the sweepstakes rules—and Post 95 merely received the sweepstakes operation's gross proceeds—deposited by Sidetracked employees into its account—and then reallocated them pursuant to the parties' agreement. Further, to the extent that Post 95 could be viewed as having any role in the provision of the amusement services, the record belies the contention that Post 95 was the "exclusive" provider of the services, as required by the exemption. *See* Tex. Tax Code § 151.3101(a)(3). Accordingly, the trial court did not err in determining that Sidetracked did not meet its summary-judgment burden to establish its entitlement to the Section 151.3101(a)(3) exemption and that the Comptroller was entitled to summary judgment regarding the exemption.

We conclude similarly as to the second exemption, which applies only to amusement services provided "through coin-operated machines that are operated by the

14

consumer." *See* Former Tex. Tax Code § 151.335(a). Sidetracked's validation terminals were operated by magnetic cards containing patrons' eligible sweepstakes entries, and validation (either instant or via slot-machine games) was the only function the terminals performed. The validation terminals thus met the definition in the Occupations Code of "coin-operated machines."[3] *See* Tex. Occ. Code § 2153.002(a) (defining "coin-operated machine" as "any kind of machine or device operated by or with a coin or other United States currency, metal slug, token, *electronic card*, or check, including a music or skill or pleasure coin-operated machine" (emphasis added)).

Sidetracked admitted in discovery that it did not register its machines, obtain the requisite licenses, or pay occupation taxes on them.[4] The Occupations Code makes it a criminal offense to own, lease, or maintain a coin-operated machine that is not registered or licensed, *see id.* §§ 2153.151, .356, or to violate any of the statutes or Comptroller rules applying to coin-operated machines, *see id.* § 2153.355. Additionally, the Comptroller—who is charged with administering the registration and licensing requirements, *see id.* § 2153.051(a), (b)—may assess civil penalties for violations of the requirements, *see id.* § 2153.354. We decline to hold that Sidetracked "clearly showed" its entitlement to a sales-tax exemption for coin-operated machines that it admittedly illegally owned and operated. *Cf. R.H. Sterns Co. of Boston, Mass. v. United*

---

[3] Although not dispositive, we note that both sides appear to agree that Sidetracked's machines were "coin-operated machines" under the Tax Code. We assume without deciding that Sidetracked's validation machines were "coin-operated machines" under the Tax Code, which—unlike the Occupations Code—does not define the term. *See generally* Tex. Tax Code §§ 151.001–151.801 (Chapter 151 of Tax Code, entitled "Limited Sales, Excise, and Use Tax").

[4] In its response to the Comptroller's cross-motion for summary judgment, Sidetracked stated that it did not register the machines because it "believed in good faith that . . . its services were fully exempt from tax, and, as a result, no such licenses . . . were required." However, a taxpayer's belief that it is exempt from taxes does not excuse it from compliance with the requirements for coin-operated machines. *Cf. Osterberg v. Peca*, 12 S.W.3d 31, 38 (Tex. 2000) (noting "deeply rooted" rule that "ignorance or mistake of law is not a defense").

*States*, 291 U.S. 54, 61–62 (1934) (noting "ultimate" principle that "no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong"). Further, the Comptroller was entitled to summary judgment because there is no material fact issue about Sidetracked's unlawful ownership and operation of the machines. We overrule Sidetracked's second issue.

***Whether Sidetracked is entitled to a refund of the taxes assessed on its payments to Post 95***

In a final "further alternative" argument, Sidetracked contends that—to the extent it made any taxable sales—it "should be assessed only on the amounts [it] received" and not on the amounts it "never received" because they "were retained" by Post 95 pursuant to the parties' agreement. In other words, it argues that it should not be taxed on the amounts it purportedly donated to Post 95 (i.e., 10% of its gross receipts). It prays that this Court "grant summary judgment in [its] favor and allow [it] to recover . . . the portion of the payment attributed to tax assessed on amounts [it] never actually received."

However, the undisputed evidence establishes that Sidetracked *did* receive all of the amounts at issue paid by patrons (whether labeled as "donations" or otherwise) participating in the sweepstakes—it then deposited those amounts into Post 95's bank account, and Post 95 retained 10% before returning a portion of the funds to Sidetracked and paying a portion to the software companies. Sidetracked does not identify any Tax Code provision exempting from the assessment of sales taxes any proceeds received from taxable sales but thereafter paid to other entities, including charities. We are not persuaded by Sidetracked's final argument and conclude that the trial court properly determined that it is not entitled to any refund on this record.

## CONCLUSION

Having overruled Sidetracked's issues, we affirm the trial court's final summary judgment.

_____
Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   December 29, 2022